[Nos. 26126-6-I; 26127-4-I.   Division One.   April 20, 1992.]

THE STATE OF WASHINGTON, *Respondent*, v. STEVEN LONEAL MONROE, *Appellant.*

*Adam Shapiro* and *Patricia Novotny* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Michele Shaw, Deputy,* for respondent.

SCHOLFIELD, J. — Steven Monroe appeals a judgment of second degree burglary and, in each of the two consolidated

cases, the imposition of a victim penalty assessment, arguing the trial court erred in inviting jurors to submit written questions to witnesses and in imposing a victim penalty assessment when he had no ability to pay. We affirm.

## FACTS

In June 1989, Seattle Police Officer Andrew Norton investigated a burglary at the home of Charlotte and Leslie Davis. Norton obtained six fingerprints on the front and back of broken glass from a basement window, all of which matched those of the accused. Monroe was charged on November 9, 1989, with second degree burglary. At voir dire on February 14, 1990, a potential juror asked if jurors could ask questions. The minute entry states:

> In absence of jury, court and respective counsel discuss a juror's request to be allowed to ask questions of witnesses. Respective counsel have no objections to this. Court will provide tablets for jurors to write out their questions. Court will then rule on whether the question may be asked, after a side-bar conference with respective counsel.

During trial, Robin Powell, an identification technician for the Seattle Police Department, testified that the fingerprints were those of Monroe. At the end of her testimony, the court stated:

> Okay. Before the witness is excused, remember, Ladies and Gentlemen, it came up in voir dire, a potential juror asked about asking questions. Mr. Vigue is going to distribute pads and pens to you. If you have a question that you would like to pose to this particular witness, I ask that you write it down. And then I will take a look at it, along with counsel, and I will rule as to whether or not it is a proper question to be asked. If it is, I will pose the question to the witness.

Similarly, after counsel concluded their examination of Officer Norton, the court asked if there were any jurors who wished to ask a question. Questions were then read out loud by the judge, including questions the trial judge concluded were improper:

> THE COURT: Is there any juror that wishes a question to be posed to the officer? Officer, I am going to ask you to hand the pads and pens to the jurors that raised their hands.
> . . . .

THE COURT: . . . Officer Norton, the jury has the following questions for you: Did it appear that the window was broken by an object or some other means, such as around the caulking?

THE WITNESS: Not, per se, around the caulking. But it did appear that the window had been broken with some type of object[.]

THE COURT: About how many feet or distance from the ground to the top of the window where prints were found?

THE WITNESS: I stand five foot ten and I could still easily reach — the top of the glass would have been in the window. I would have to say just perhaps around six feet from the ground up.

THE COURT: Do you recall what shape the ground was in around the window of the entrance, i.e. muddy, damp, dry?

THE WITNESS: I can't recall specifically, no.

THE COURT: Were there any visible signs of a bicycle near this same window?

THE WITNESS: Not that I can recall, no.

THE COURT: The following question is not one for you to answer. The Court believes that this is within the common range of experience for the jurors. The question was: In your opinion and experience was the broken window large enough for an average size adult to fit in or out of? In your opinion could a 19 inch television fit through the window, and is it possible that someone could lift the television himself or herself through the window? The question you are to answer, Officer, is how high was the bottom of the broken window from the floor of the basement?

THE WITNESS: [To the] best of my recollection I would have to estimate about five feet. That's just a recollection.

Charlotte Davis testified that Monroe and his friend Enid Cooper visited in June 1989, and listened to Charlotte's favorite cassette tape. Monroe visited again, arriving on a red bicycle, and he and Enid came for dinner that evening, and visited the next day, June 9, 1989. Later that evening Monroe asked to borrow Charlotte's favorite tape. She declined. Monroe asked if she was leaving for Los Angeles the next day. Charlotte said she was leaving the next morning at 9, and that her husband, Leslie, would go to the bus station with her and then return home. After returning from Los Angeles, she discovered her favorite tape was missing and found its empty case on the kitchen floor.

After Charlotte Davis was examined by counsel, the court asked for jurors' questions:

THE COURT: Does any member of the jury have a question that they wish to ask?

JUROR: Yes.

THE COURT: Would you write out your question, please.

THE COURT: Mr. Holt, could you assist me by collec[t]ing the questions and bringing them to side bar with Mr. Thomas?

. . . .

. . . Ms. McCartie, do you have any?

JUROR: (Shakes head)

THE COURT: Okay. Ladies and Gentlemen, I have taken your questions and gone over them with counsel and I am going to ask similar questions in perhaps a slightly different wording. First question, Ms. Davis, was your husband living at home when you were in California?

THE WITNESS: Yes.

THE COURT: Parties have agreed to allow the jury to know that the tape cover was not submitted for fingerprinting. Where was the tape left when you left the house to catch the bus to go to California?

THE WITNESS: It was in the stereo cassette ready, you know, inside. It was already set to be played. All you had to do was push a button to make it play or stop it or anything.

THE COURT: Was the tape player taken?

THE WITNESS: No, the tape player is still at the house.

THE COURT: Would it have been difficult to park the bike by the window because of the brush?

THE WITNESS: No, it's just, it's muddy and it's just grass. I don't know if they have a picture of it; but it's not concrete. It's the mud. And the dog was normally in the front of the house on top of the stairs and the chain reached all the way around so she can go from this way to that way at the side of the house.

THE COURT: Were the items stolen ever recovered?

THE WITNESS: No.

Leslie Davis testified that he met Monroe, but did not participate in a party with him and the others, and did not take Monroe on a tour of the house, nor allow him in the basement. When Leslie returned from taking Charlotte to the bus, he discovered the television and VCR were missing, and the basement window was broken.

Following the testimony, the court asked for questions:

THE COURT: Ladies and Gentlemen of the Jury, are there any questions that you wish the Court to pose to Mr. Davis? If there are, please write them out. Mr. Vigue, would you assist me by gathering up the questions, please? Counsel, to the side bar, please.

THE COURT: Mr. Davis, the jury has some questions for you, sir.

THE WITNESS: Yeah.

THE COURT: How large was the TV that was stolen?

THE WITNESS: It was 19 inches.

THE COURT: Was there a cable box that went with the TV?

THE WITNESS: Yeah, but the cable box was left there.

THE COURT: Did you play cards or dominoes with the defendant?

THE WITNESS: One day I did play dominoes with him.

THE COURT: What room was the TV and VCR in?

THE WITNESS: In my living room when you come in the front door.

THE COURT: When was the last time you saw the window in one piece prior to the burglary?

THE WITNESS: Let's see, I know it was in there the morning I left with my wife.

THE COURT: Did you see it on t[h]e morning you left?

THE WITNESS: Yeah, because I went down in the basement and when I — that's when I put the dog down there.

THE COURT: Where was the dog when you arrived home from leaving Mrs. Davis at the bus?

THE WITNESS: Where was the dog when I arrived home? The dog was still in the basement, but it was — there is an old raggedy bed. He was laying on it.

THE COURT: The question, Mr. Davis, I don't want you to answer this question, but the question is "What type of agreement did you have with Color Time?["] The Court rules it is not relevant. Was there insurance on the TV and VCR? Also not relevant to these proceedings. Next question: "Did you find the tape holder of your wife's favorite tape?["]

THE WITNESS: The tape — my wife said she had a favorite tape and it was gone.

THE COURT: Did you find the holder to it, sir?

THE WITNESS: The holder, what is that?

THE COURT: The case that the tape comes in.

THE WITNESS: I think she did find it, not me.

Monroe's friend Enid Cooper testified that on the third visit to the Davis home, Charlotte showed them around the house, including taking them into the basement. Ms. Cooper also said she and Monroe went to a Fourth of July celebration at the Davis home.

After counsel concluded examining Ms. Cooper, the court again asked for questions:

THE COURT: Members of the Jury, do any of you have any particular questions you wish to pose to Ms. Cooper?

THE COURT: Mr. Vigue, would you please gather the questions? And, counsel, would you come to the side bar?

Ms. Cooper, the jury has some questions for you. In June of 1989 did either Steve, Angie or you own or have a cassette player?

THE WITNESS: Angie did.

THE COURT: Did Steve Monroe ever indicate to you that he stole the TV and VCR or any item from the Davis[es]?

THE WITNESS: No.

THE COURT: Why did he ride his bicycle? Why didn't he walk with you?

THE WITNESS: He [a]lways rode his bicycle.

THE COURT: Where was Steve Monroe on the morning of this incident?

THE WITNESS: I don't know. At home with me.

THE COURT: Who was present when you toured the house?

THE WITNESS: Charlotte, Leslie and his daughter, the dog.

THE COURT: This is similar to the other question. Do you know where the defendant was between 9:00 a.m. and 11:30 a.m. on June 10th?

THE WITNESS: With me.

THE COURT: Thank you. You may step down.

In rebuttal, Charlotte testified that Enid and Monroe did not attend the Fourth of July party, nor did she give Enid a tour of her house. A juror inquired whether Charlotte had recovered her favorite tape.

THE COURT: Ladies and Gentlemen, are there any questions you wish to pose?

JUROR: Yes.

. . . .

THE COURT: The questions are essentially the same. "Ms. Davis, was your favorite tape ever recovered?"

THE WITNESS: No, it wasn't.

The jury convicted Monroe on February 20, 1990, of second degree burglary. He was sentenced on April 13, 1990, within the standard range and fined a $100 victim penalty assessment in each of the two consolidated cases.

### JUROR QUESTIONS

Monroe contends that the lower court erred when it invited jurors to question witnesses because his constitutional right to an impartial jury was thereby subverted. Although Monroe did not object to the practice below, he argues that the issue may be raised for the first time on

appeal under RAP 2.5(a).[1] Our discussion begins with whether the trial court committed a "manifest error affecting a constitutional right." We find it did not.

■■ In general, a trial court has the responsibility of directing the conduct of a jury trial and, consequently, exercises discretion in a wide range of trial issues. *State v. Johnson*, 12 Wn. App. 548, 550-51, 530 P.2d 662, *review denied*, 85 Wn.2d 1012 (1975). The Washington Rules of Evidence do not explicitly address the issue of allowing or disallowing juror questions. ER 611(a) states that a trial court shall exercise reasonable control over the mode of interrogating witnesses. ER 614(b) allows a court to interrogate witnesses provided the questioning is "cautiously guarded so as not to constitute a comment on the evidence." Despite there being no explicit Washington law governing jurors questioning witnesses, there is authority in Washington for the practice. WPIC 4.66 provides:

> A juror who wants to ask a question of a witness must wait until both lawyers have completed their questioning of that witness. If at that time the juror still has some question, the juror will be given an opportunity to write it out and submit it to the court so that it can be decided whether the question is legally proper.
> (Questioning by counsel proceeds to conclusion.)
> [Mr.][Ms.] ____, Juror No. ____, do you have a question at this time which you want to write out? If so, the bailiff will hand you a pencil and paper.

The comment following WPIC 4.66 states that the instruction should not be given unless a juror expresses a desire to question a witness. It also states the matter is discretionary, but it is "advisable that a judge should not encourage jurors to ask questions" because it interrupts trial.

---

[1]RAP 2.5(a) states:

"The appellate court may refuse to review any claim of error which was not raised in the trial court. However, a party may raise the following claimed errors for the first time in the appellate court: . . . (3) manifest error affecting a constitutional right."

Almost without exception, jurisdictions outside Washington accept some degree of jury questioning of witnesses. Many courts hold it to be purely a matter of discretion. *United States v. Witt*, 215 F.2d 580 (2d Cir.), *cert. denied sub nom. Talanker v. United States*, 348 U.S. 887, 99 L. Ed. 697, 75 S. Ct. 207 (1954); *United States v. Callahan*, 588 F.2d 1078 (5th Cir. 1979); *State v. Johnson*, 784 P.2d 1135, 1144-45 (Utah 1989); *United States v. Lewin*, 900 F.2d 145, 147 (8th Cir. 1990); *Carter v. State*, 250 Ind. 13, 234 N.E.2d 650, 31 A.L.R.3d 868 (1968). In addition, courts generally require actual prejudice before an appellate court may reverse a judgment. *DeBenedetto v. Goodyear Tire & Rubber Co.*, 754 F.2d 512, 517, 80 A.L.R. Fed. 879 (4th Cir. 1985).

Although courts agree that juries should be well informed, most courts have pointed out the risks of harm in the practice. For example, in *Morrison v. State*, 815 S.W.2d 766 (Tex. Ct. App. 1991), a juror posed a question that defense counsel objected to as requiring a hearsay answer, prompting the prosecutor to request recalling the witness to ask the question. Over defense objections, the prosecutor then asked the question of the witness. The *Morrison* court reversed the trial court, finding it had abused its discretion in allowing the prosecutor to recall the witness. The court declined to outlaw the practice of jurors submitting questions entirely, but it criticized a statement in *Callahan* that juror questions should "alert" trial counsel to issues that need development. The court found that such questions can act as improper communication between jury and counsel, and generally favor the prosecutor because it signals the jurors' doubts and perceived weaknesses in the State's evidence.

The court in *DeBenedetto*, at 516, stated that "the practice of juror questioning is fraught with dangers which can undermine the orderly progress of the trial to verdict." The court warned of the potential risk that a juror's question, even if screened out by the trial judge but heard by other jurors, might provoke "mental reactions" in other jurors:

In the case where such a question is rejected, not only the questioning juror but the other jurors are likely to retain what-

ever mind-set has been generated by the question, leaving the court and counsel to ponder, under the stress of trial, how much influence a *juror* question, answered or unanswered, may have had on the perceptions of the jury as a whole.

*DeBenedetto*, at 516. Remedial steps may make a juror feel "abashed and uncomfortable, and perhaps even angry" if his question is thwarted by rules he does not understand. In the worst case, a juror's question may be so prejudicial that a mistrial is the only viable option. *DeBenedetto*, at 516. Other dangers include the possibility jurors will place undue significance on answers to questions given by an influential juror; one or more jurors will dominate the questioning process; or the deliberative process may begin prematurely with juror questions that necessarily reflect deliberative consideration of the evidence. Furthermore, there is the risk of a subtle shift from the role of neutral factfinder to that of advocate. *See United States v. Johnson*, 892 F.2d 707, 714 (8th Cir. 1989) (Lay, J., concurring) (to remain neutral, the jury needs to listen to the case as it is developed by the advocates; "[i]f the juror begins to match his interrogation skills with the lawyer all of that [impartiality] is lost.").

To ameliorate the risks that a defendant or litigant will be denied due process, many states require a procedure, similar to the one used by the court below, where counsel have an opportunity to object to the question out of the jury's hearing. *See, e.g.*, *Velasquez v. State*, 815 S.W.2d 842, 846 (Tex. Ct. App. 1991); *State v. LeMaster*, 137 Ariz. 159, 164-65, 669 P.2d 592, 597-98 (Ct. App. 1983); *United States v. Polowichak*, 783 F.2d 410, 413 (4th Cir. 1986); *United States v. Gray*, 897 F.2d 1428, 1429 n.1 (8th Cir. 1990). Only one jurisdiction (Nebraska) has prohibited the practice on due process grounds.

Since due process requires a fair trial before a fair and impartial jury, the judicial process is better served by the time-honored practice of counsel eliciting evidence which is heard, evaluated, and acted upon by jurors who have no investment in obtaining answers to questions they have posed.

(Citation omitted.) *State v. Zima*, 237 Neb. 952, 956, 468 N.W.2d 377, 379-80 (1991).

In the present case, most of the procedures suggested in the WPIC were followed. After the written questions were submitted to the judge, counsel had an opportunity to review them before the judge read them to the witness. Against the advice of the WPIC, however, the trial judge actively encouraged jurors to submit questions. The judge also read the questions that were *not* to be answered (such as whether the Davises had insurance), thus alerting all the jurors to the prohibited questions, and apparently did not give counsel an opportunity to interrogate the witnesses on the subjects raised by the jurors' questions. For the most part, any departure from the WPIC was minor and did not appear to have prejudiced the parties. Of the 20-some questions asked, most appear innocuous — neither prejudicial nor probative — with the notable exception of the improper questions that were read but not answered.

Although we believe the active solicitation of juror questions is inappropriate and the trial judge should not have read those questions ruled improper, we do not find that the trial court committed constitutional error. Accordingly, because the practice was not objected to below and because there was no constitutional error, we decline to accept review under RAP 2.5(a), and dismiss the appeal based on the failure to object.[2]

### VICTIM PENALTY ASSESSMENT

Monroe contends that a sentencing court may not impose financial obligations if it fails to determine the offender is able to pay.

---

[2]The appellant's additional constitutional challenge concerning denial of effective assistance of counsel is without merit, because Monroe fails to show how his attorney's performance was deficient, or that prejudice resulted. Certainly no case holds that failure to object to juror questioning of witnesses constitutes deficiency of counsel. Similarly, Monroe fails to show how allowing juror questioning amounted to rulemaking, much less how that rises to constitutional magnitude.

■ *State v. Curry*, 62 Wn. App. 676, 680-81, 814 P.2d 1252 (1991) determined there was no error, constitutional or otherwise, in a trial court's failure to find that an offender is able to pay a victim penalty assessment. Accordingly, the trial court did not err in assessing Monroe a $100 victim penalty assessment in each of the consolidated cases herein.

Affirmed.

WEBSTER, A.C.J., and FORREST, J., concur.

Review denied at 119 Wn.2d 1019 (1992).