[No. 31094-9-III.   Division Three.   June 19, 2014.]

THE STATE OF WASHINGTON, *Respondent*, v. EDWARD W. TERRY, *Appellant*.

*Kristina M. Nichols* (of *Nichols Law Firm PLLC*), for appellant.

*Rea L. Culwell, Prosecuting Attorney*, for respondent.

¶1 SIDDOWAY, C.J. — During Edward Terry's criminal trial for theft of a vehicle and related charges, the trial court invited jurors to propose questions. One juror question accepted by the trial court and posed to the deputy who arrested Mr. Terry was whether Mr. Terry ever questioned or expressed surprise at being arrested. The deputy answered that Mr. Terry did not ask, and in closing argument, the prosecutor reminded the jurors of that answer and argued that Mr. Terry did not ask because "[he] knew that he had stolen a vehicle and he was going to get caught." Report of Proceedings (RP) at 329. Mr. Terry's lawyer did not object to the juror's question on constitutional grounds or object to the prosecutor's argument. For the first time on appeal, Mr. Terry argues that the testimony and argument violated constitutional protections against self-incrimination and his right to due process.

¶2 An error of manifest constitutional proportions occurred here, including as a result of the court-posed ques-

tion. The error was not harmless as to most of the counts charged. It requires a new trial on all of the challenged convictions other than his conviction for resisting arrest.[1]

¶3 Given that disposition, we do not reach Mr. Terry's remaining assignments of error other than his request that we order all of the charges against him dismissed on the basis of allegedly insufficient evidence. The evidence against him was sufficient. We reverse the convictions of theft of a vehicle, possession of a stolen vehicle, and trespassing and remand for a new trial on those counts.

## FACTS AND PROCEDURAL BACKGROUND

¶4 Edward Terry was arrested after he was followed from the scene of a one-car accident on a county road near Dayton. The accident was witnessed by Angelia and Gordon Smith, who were standing outside at around 7 a.m. when they saw an approaching truck round a corner at a high rate of speed, spin out on gravel, hit the bank on the side of the road, and flip over. The driver crawled from under the truck and ran through a wheat field up a nearby hill, away from the crash site. Mr. Smith saw the individual "turn[ ] around in kind of a swinging motion, looked like he threw something." RP at 172.

¶5 Ms. Smith immediately called her OnStar service, which conveyed her report of the accident to 911. Although she and her husband were as much as a quarter of a mile away from where the truck flipped over, they described the driver to the OnStar representative who answered their call as between 5 feet 6 inches and 6 feet tall, wearing dark clothing, having long dark hair, and wearing a hoodie or a cap, and jeans.

¶6 Columbia County Deputy Sheriff Richard Loyd responded to the report of the accident and spoke to Mr.

---

[1] Mr. Terry's judgment and sentence included his conviction of an assault committed in March 2012 that he does not challenge.

Smith, who had walked to the truck to make sure no one else was inside. Mr. Smith told Deputy Loyd which direction the driver had run. He also explained that the farm on which they were standing was his, that he was familiar with the terrain over the hill, and that he thought they could probably catch up with the driver. The deputy took Mr. Smith up on his offer of help, and the two went looking for the driver in the deputy's sport-utility vehicle.

¶7 Two miles from the crash site, Mr. Smith and Deputy Loyd saw Mr. Terry walking slowly. Deputy Loyd knew Mr. Terry from prior contacts. Mr. Terry is 6 feet 2 inches tall and at the time had very short hair.

¶8 The deputy approached Mr. Terry and ordered him to stop and get on the ground. Mr. Terry refused and made a contemptuous finger gesture at Mr. Smith and the deputy. Deputy Loyd then approached Mr. Terry with his gun drawn. When he was close enough to satisfy himself that Mr. Terry was not armed, the deputy put away his sidearm and drew his stun gun, again telling Mr. Terry to get on the ground and put his hands behind his back or he would be "tased." RP at 228. In what testimony suggests was a sardonic tone, Mr. Terry responded, " 'Oh, a taser' " and renewed the finger gesture, although this time using both hands. *Id.* He then turned his back on the deputy and Mr. Smith, dropped his pants, and, as Mr. Smith would later testify, "mooned both of us." RP at 179. That done, he pulled up his pants, dropped to the ground, and put his hands behind his back.

¶9 The deputy attempted to handcuff Mr. Terry, telling him to turn his head away; he later explained to the jury that when handcuffing an individual who is prone, officers prefer to be out of the individual's line of sight. Mr. Terry did not comply, answering, according to the deputy, "[T]hat was all I was going to get." RP at 229. The officer then walked around to Mr. Terry's other side. He placed a handcuff on Mr. Terry's left wrist, but when he reached to cuff the second wrist, Mr. Terry tried to push up against the

deputy, roll over, and bite him. Deputy Loyd told Mr. Terry he was resisting arrest, which Mr. Terry denied. Deputy Loyd then used a pressure compliance technique, and Mr. Terry relented and allowed Deputy Loyd to finish handcuffing him. The deputy would later testify that the basis for the arrest was trespass.

¶10 Deputy Loyd took Mr. Terry to the sheriff's department. During the booking process, Ralph Frame, who owned the truck in which Mr. Terry had been driving, called the department to report that his truck had been stolen. He had left it parked in front of his shop the night before with the keys inside, and in the morning it was gone. It turned out that Mr. Frame's shop was a quarter mile from where Mr. Terry lived with his mother and was 10 to 12 miles from the crash site.

¶11 After booking Mr. Terry and traveling to speak to Mr. Frame, Deputy Loyd returned to the scene of the crash to further investigate. He was unable to find the keys to the truck either in the truck or in the area of the field where Mr. Smith thought he had seen Mr. Terry swing his arm as if to throw something. He saw footsteps leaving the crash site and going up into the field. Hoping to better tie Mr. Terry to the stolen truck, the deputy attempted to follow the path of the footprints through wheat fields, a pea field, and an access road that lay between where the truck rolled and where he arrested Mr. Terry. Using a GPS (global positioning system) device, he tracked his steps, later producing a topographical map that showed where he had been able to follow the footprints and where, on several occasions, he lost them. He took pictures of the tracks and later obtained pictures of Mr. Terry's shoe tread, taken at the jail.

¶12 Mr. Terry was eventually charged with theft of a vehicle, possession of a stolen vehicle, trespassing, and resisting arrest.

¶13 At trial, Mr. Smith and Deputy Loyd testified that when Mr. Terry was encountered and arrested, Mr. Smith had identified him as the individual he had seen climbing

out of the truck. Although Mr. Terry proved taller than Mr. Smith initially believed and Mr. Smith's description of his hair and clothing did not prove accurate, Mr. Smith expressed confidence in his identification from the fact that it was early in the morning and he and his wife had seen no one else around. He testified that from his and Deputy Loyd's first sighting of Mr. Terry he felt sure from his appearance and location that he was the individual who crawled out of the truck and ran up the hill. He admitted that he had been too far away to see facial features and that he could not positively identify Mr. Terry at the time of trial.

¶14 Deputy Loyd described the map he had created tracking footsteps from the crash site to where he and Mr. Smith encountered Mr. Terry and testified that the tracks made through the field were made by the shoes worn by Mr. Terry at the time of his arrest.

¶15 The trial court allowed jurors to propose questions during the trial. When given the opportunity to propose questions after Deputy Loyd's testimony, a juror wrote, " 'Did he, Eddie Terry, ever ask or wonder why he was arrested? Was he surprised he was arrested?' " RP at 292. Mr. Terry's counsel objected on hearsay grounds and that the question called for speculation by the deputy. The court overruled the objections and posed the questions. The deputy answered "No" when asked if Mr. Terry asked or wondered why he was arrested. RP at 294. In response to the question about whether Mr. Terry was surprised, the deputy said, "I don't know if he was surprised or not." *Id.*

¶16 During closing argument, the prosecutor referred to the juror's question and Deputy Loyd's response:

> One more item I want to talk about in regards to resisting arrest, and actually applicable, ah, to all the charges here is: when Deputy Loyd was asked, did the defendant ask why he was being arrested? No. He knew. He knew that he had stolen a vehicle and he was going to get caught. He knew that he

possessed that vehicle and wrecked it. He knew that he trespassed. That's why he didn't ask the question.

RP at 329.

¶17 The jury found Mr. Terry guilty as charged. He appeals.

## ANALYSIS

*Unconstitutional use of Mr. Terry's postarrest silence*

¶18 Mr. Terry contends that his rights under the United States and Washington Constitutions were violated, first, when the trial court posed a juror's questions to Deputy Loyd that invited a response from the deputy that Mr. Terry never asked why he was being arrested, and second, when the prosecutor then argued in closing that Mr. Terry's failure to ask about his arrest was probative of guilt. Mr. Terry argues that both were impermissible comments on his postarrest silence, in violation of constitutional protections against self-incrimination and requirements of due process.

¶19 The State argues that "[a] reasonable interpretation is that the juror question applies to the *pre-arrest* time period when Mr. Terry was first being approached by Deputy Loyd," so that only constitutional protections against compelled testimony are implicated, not the right to due process. Br. of Resp't at 24 (emphasis added). Whether the testimony and argument were a comment on *prearrest* rather than *postarrest* silence can make a difference after the United States Supreme Court's decision in *Salinas v. Texas*, ___ U.S. ___, 133 S. Ct. 2174, 186 L. Ed. 2d 376 (2013).

¶20 In *Salinas*, a three-member plurality of the Supreme Court held that if an individual voluntarily submits to an interview by police and reaches a point at which he or she

chooses not to speak based on Fifth Amendment rights,[2] he or she must affirmatively invoke those rights. Otherwise, the State may offer and the jury may consider the fact that a defendant failed or refused to speak to law enforcement in circumstances where an innocent person would reasonably be expected to speak. As explained by the Court, "[P]opular misconceptions notwithstanding, the Fifth Amendment guarantees that no one may be 'compelled in any criminal case to be a witness against himself'; it does not establish an unqualified 'right to remain silent.'" 133 S. Ct. at 2182-83.

¶21 The petitioner in *Salinas* agreed to speak to officers investigating a murder but balked when the officer asked whether a ballistics test would tie shell casings found at the crime scene to the petitioner's shotgun. At trial, the officer was permitted to testify to the petitioner's suspicious silence in response to that question and the prosecutor was permitted to argue that the petitioner's reaction suggested guilt. The plurality decision in *Salinas* held that the testimony and argument was unobjectionable because the petitioner was speaking to the investigating officer voluntarily and "it would have been a simple matter for him to say that he was not answering the officer's question on Fifth Amendment grounds. Because he failed to do so, the prosecution's use of his noncustodial silence did not violate the Fifth Amendment." *Id.* at 2180.[3] Since "'no ritualistic formula is necessary in order to invoke the privilege [against self-incrimination],'" *id.* at 2178 (quoting *Quinn v. United*

---

[2] U.S. Const. amend. V (made applicable to the states through the Fourteenth Amendment as recognized in *Malloy v. Hogan*, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964)).

[3] Two justices (Thomas and Scalia, JJ.) expressed their disagreement with *any* limitation on the State's right to comment on a defendant's silence or failure to testify. They characterized *Griffin v. California*, 380 U.S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965), which held that the Fifth Amendment prohibits a prosecutor or judge from commenting on a defendant's failure to testify as "'lack[ing] foundation in the Constitution's text, history, or logic'" and establishing a principle that "should not be extended." *Salinas*, 133 S. Ct. at 2184 (Thomas, J., concurring in judgment) (quoting *Mitchell v. United States*, 526 U.S. 314, 341, 119 S. Ct. 1307, 143 L. Ed. 2d 424 (1999) (Thomas, J., dissenting)).

*States*, 349 U.S. 155, 164, 75 S. Ct. 668, 99 L. Ed. 964 (1955)), courts faced with the admissibility of *prearrest* silence after *Salinas* have examined the defendant's conduct to see if an invocation of Fifth Amendment rights was either express or implied. *See, e.g., United States v. Okatan*, 728 F.3d 111 (2d Cir. 2013) (while defendant did not say "Fifth Amendment" or "privilege against self-incrimination," his expression of a desire to speak with a lawyer sufficed to invoke the privilege).

¶22 The Washington Constitution includes its own provision against self-incrimination, but it provides no greater protection; the Washington Supreme Court has held that it " 'envisions the same guarantee as that provided in the federal constitution.' " *State v. Mecca Twin Theater & Film Exch., Inc.*, 82 Wn.2d 87, 91, 507 P.2d 1165 (1973) (quoting *State v. Moore*, 79 Wn.2d 51, 57, 483 P.2d 630 (1971)); *In re Pers. Restraint of Ecklund*, 139 Wn.2d 166, 172 n.6, 985 P.2d 342 (1999) (the federal and state constitutional provisions "are given the same interpretation").

██ ██ ¶23 Commenting on postarrest silence raises a second constitutional concern, grounded in due process. Warnings under *Miranda*[4] given upon arrest "constitute an 'implicit assurance' to the defendant that silence in the face of the State's accusations carries no penalty," making it fundamentally unfair to then penalize the defendant by offering his silence as evidence of guilt. *State v. Easter*, 130 Wn.2d 228, 236, 922 P.2d 1285 (1996) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993); *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976)). For the government to comment on post-*Miranda* silence is to "[break] its promises given in the *Miranda* warnings and violate[ ] due process of law." *State v. Burke*, 163 Wn.2d 204, 213, 181 P.3d 1 (2008).

¶24 The State recognizes that controlling case law is more protective of a defendant's postarrest silence when it

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

argues that we should regard the juror's question as addressed to the prearrest time period. But its argument that the juror was interested in prearrest events is grounded more in hope than in reality. The juror's questions, as handwritten by the juror and read by court, asked if Mr. Terry ever "ask[ed] or wonder[ed] why he *was arrested*" or was "surprised that he *was arrested*." Clerk's Papers at 120 (emphasis added); RP at 292. The questions followed Deputy Loyd's testimony that he ordered Mr. Terry to stop and drop immediately upon encountering him, drew his gun when Mr. Terry did not comply, undertook to handcuff him, and then read Mr. Terry his *Miranda* rights, in response to which Mr. Terry said he understood his rights. The deputy also testified that Mr. Terry "immediately told me he didn't want to talk to me," although that answer was stricken upon objection. RP at 231. In short, the jury had not heard testimony about any meaningful prearrest period to which the juror's questions could have been directed. We are dealing, then, with testimony and argument involving postarrest silence.

¶25 The State next argues that because Mr. Terry failed to object to the juror's question on constitutional grounds and did not object at all to the prosecutor's argument, he may not raise the due process issue for the first time on appeal. Ordinarily, we will not review an error to which no objection was made in the trial court. RAP 2.5(a). This includes error involving an improper reference to a defendant's postarrest silence; an exception exists, however, for "manifest error affecting a constitutional right." RAP 2.5(a)(3); *Burke*, 163 Wn.2d at 224 (Madsen, J., dissenting).

¶26 The Washington Supreme Court has distinguished between "comments" and "references" to a criminal defendant's silence, recognizing that "[b]oth are improper, but only the former rise to the level of constitutional error," and that what are merely improper references "are not reviewable for the first time on appeal." *Burke*, 163 Wn.2d at 225 (citing *State v. Romero*, 113 Wn. App. 779, 790-91, 54

P.3d 1255 (2002)). The distinction "focus[es] largely on the purpose of the remarks." *Id.* at 216 & n.7 (collecting examples). A "comment" occurs when the State uses a defendant's silence as substantive evidence of guilt or suggests the silence was an admission of guilt. *State v. Gregory*, 158 Wn.2d 759, 838, 147 P.2d 1201 (2006) (quoting *State v. Lewis*, 130 Wn.2d 700, 707, 927 P.2d 235 (1996)).

¶27 In *Romero*, this court suggested a two-part analytical framework for determining whether a State agent's direct or indirect comments during trial on a defendant's silence amount to constitutional error. The first step asks whether the comment was "direct," in the sense examined in *Lewis*, which is to ask whether the witness effectively stated or expressed an opinion that the defendant's silence was evidence of guilt. *See Lewis*, 130 Wn.2d at 706. A direct comment is automatic constitutional error.

¶28 If the comment was not direct, *Romero* suggested three questions, drawn from earlier Washington cases, from which to determine whether the State was seeking to capitalize on an *inference* of guilt in a manner violating the defendant's rights:

> First, could the comment reasonably be considered purposeful, meaning responsive to the State's questioning, with even slight inferable prejudice to the defendant's claim of silence? Second, could the comment reasonably be considered unresponsive to a question posed by either examiner, but in the context of the defense, the volunteered comment can reasonably be considered as either (a) given for the purpose of attempting to prejudice the defense, or (b) resulting in the unintended effect of likely prejudice to the defense? Third, was the indirect comment exploited by the State during the course of the trial, including argument, in an apparent attempt to prejudice the defense offered by the defendant?

*Romero*, 113 Wn. App. at 790-91 (citations omitted). Answering yes to any of the questions means the indirect comment is an error of constitutional proportions. *Id.* at 791.

¶29 The second question suggested by *Romero* must be answered no here because Deputy Loyd's answer was di-

rectly responsive to the court's question; he volunteered nothing more. A necessary variant of the first question and the third question must both be answered yes, however.

¶30 The State argues that the first question must be answered no because it did not pose the question about silence—the court did. As a result, it argues, constitutional error was avoided. We disagree. *Romero* did not consider the possibility of testimony that is responsive to a juror- or court-posed question that invites a prejudicial inference or implication of guilt. The fact that the question was posed by the court makes it uniquely problematic and requires that the first question be modified in the circumstances present here.

■ ■ ¶31 Before Mr. Terry's trial, the State agreed to invite jurors to ask questions. It is a practice that is standard and acceptable in civil trials, *see* CR 43(k), but that is discouraged in criminal trials because of the risks of harm it presents. A comment to former *Washington Pattern Jury Instruction (Criminal)* 4.66, which was to be given when jurors posed questions in criminal trials, stated that the instruction should not be given unless a juror expressed a desire to question a witness and that it was " 'advisable that a judge should not encourage jurors to ask questions.' " *State v. Monroe*, 65 Wn. App. 245, 251, 828 P.2d 24 (1992) (quoting 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.66 cmt. (1977) (WPIC)). The *Monroe* court agreed with authors of the pattern instructions in discouraging the practice, stating that "we believe the active solicitation of juror questions is inappropriate." *Id.* at 254. *State v. Munoz*, 67 Wn. App. 533, 538, 837 P.2d 636 (1992) reiterated disapproval of actively soliciting juror questions, recognizing that "[p]otentially serious problems could arise from juror questions." Following *Monroe* and *Munoz*, the authors of the Washington pattern instructions withdrew WPIC 4.66 (1977). The comments to the withdrawn instruction state that "[g]iven the concerns expressed by the Court of Appeals, the committee recommends trial courts not raise the issue unless a juror inquires." 11

WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.66, at 130-31 (3d ed. 2008).

¶32 Having nonetheless exercised its discretion to invite juror questions in Mr. Terry's trial, the trial court read an instruction that described for jurors how and when they could write out and submit their questions. It included the following explanation, modified from WPIC 4.66 (1977):

> *I will review the question*—actually, I have to, ah, excuse you across the hall, then I review the questions with the lawyers outside your presence, ah, *to make sure they're . . . in allowable form and don't violate some technical rule of evidence, and I'll review it to make sure it's legally proper.* There are some questions I won't ask. . . . It will often be the case that a lawyer has not asked a question because it's legally objectionable or because a later witness may be addressing that subject.

RP at 151-52 (emphasis added). Given the highlighted language, the instruction implicitly communicated to the jurors that any question the judge accepted and posed would be "in allowable form," would not violate any technical rule of evidence, and would be "legally proper."

¶33 It is reasonable to assume that the juror who asked whether Mr. Terry wondered why he was being arrested thought it was a good question, since if Mr. Terry was unsurprised it would tend to prove guilt. When the question was accepted by the court and posed to Deputy Loyd, it received institutional imprimatur in the eyes of the jurors. A leading treatise has recognized that among the risks of permitting jury questions is that "the jurors will attach inordinate weight to the witnesses' answers to the jurors' questions and slight the testimony elicited by the parties." 1 McCORMICK ON EVIDENCE § 8 (Kenneth S. Broun ed., 7th ed. 2013). Whether we view the State as one of the gatekeepers of jury questions posed in a criminal trial or analyze this as a problem of independent trial court error, the outcome is the same. *Cf. Griffin v. California*, 380 U.S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965) (treating the trial court's

instructions on permissible inferences from silence and the State's argument as equally problematic). We conclude that where a juror-proposed, court-posed question in a criminal trial invites a comment on a defendant's silence, a fourth question must be added to the second step of the *Romero* analysis: has the State *acquiesced* in a question by the trial court that results in a responsive comment that even slightly and prejudicially infers or implies guilt from a defendant's silence? If the answer is yes, as it is here, then an issue of constitutional error is raised that must survive constitutional error review.

¶34 The answer to the third *Romero* question provides further support for the manifest constitutional character of the error in this case. The State not only acquiesced in a question that elicited testimony prejudicially inferring or implying guilt, it then highlighted that inference or implication and encouraged the jury to rely on it. It cannot be seriously contended that the prosecutor's closing argument was merely a passing reference that was not relied on by the State as evidence of guilt. The State's exploitation of Deputy Loyd's indirect comment on Mr. Terry's silence presents further constitutional error.

¶35 The question that remains is whether the error was harmless. A constitutional error is harmless only if the reviewing court is convinced beyond a reasonable doubt that any reasonable jury would reach the same result absent the error and where the untainted evidence is so overwhelming that it necessarily leads to a finding of guilt. *Burke*, 163 Wn.2d at 222; *State v. Emery*, 174 Wn.2d 741, 757, 278 P.3d 653 (2012) (constitutional harmless error standard applies to direct constitutional claims involving prosecutors' improper arguments).

¶36 As to the three crimes that are alleged to have preceded the deputy's encountering Mr. Terry, the comments were not harmless. Mr. Smith lost sight of the driver of the truck after he crested the first hill, and his and his wife's initial description of the driver did not match Mr.

Terry. Deputy Loyd did not testify to any forensic training or expertise in matching footprints to a particular shoe, and he admitted he was unable to locate an unbroken footprint trail between the crash site and the location where he and Mr. Smith encountered Mr. Terry. The evidence was not sufficiently overwhelming to necessarily lead to a finding of guilt, and there is a real risk that the jury attached special significance to the response to, and argument from, the juror's question.

¶37 As to the resisting arrest charge, however, the error was harmless. Deputy Loyd's and Mr. Smith's testimony as to what transpired during the course of the arrest was consistent and undisputed and included both men's testimony that the deputy accused Mr. Terry of resisting during the course of the arrest. Mr. Smith testified first, telling the jury that "the Officer said, 'You're resisting arrest.' [Mr. Terry] said, 'No, I'm not.' At one time I saw him try and bite the Officer, so I kind of figured that was resisting in my mind." RP at 179. The deputy's recollection was that he told Mr. Terry "to stop resisting." RP at 230. Given Mr. Smith's testimony that Mr. Terry was aware of the perception that he was resisting arrest and denied it, the State's comments do not present the same problem with respect to the resisting arrest charge. There was no question of Mr. Terry's identity with respect to that charge, either; the testimony was undisputed and overwhelming.

¶38 We affirm the conviction of resisting arrest. We reverse the convictions of theft of a vehicle, possession of a stolen vehicle, and trespassing and remand for a new trial on those counts. In light of that disposition, we need not reach Mr. Terry's remaining assignments of error, which address matters that might not arise in a new trial or, if they do, will involve a different record.

¶39 The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accor-

dance with the rules governing unpublished opinions. RCW 2.06.040.

FEARING, J., and ANTOSZ, J. PRO TEM., concur.