**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| RONALD HENRY MITCHELL, | ) | No. 79292-0-I |
| | ) | |
| Appellant, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| THE STATE OF WASHINGTON, | ) | |
| | ) | UNPUBLISHED OPINION |
| Respondent. | ) | |
| | ) | |

MANN, C.J. — Ronald Mitchell appeals his conviction for murder in the second degree. Mitchell argues: (1) that the trial court erred in denying his request for a jury instruction on the lesser included offense of manslaughter in the second degree, (2) that the trial court violated his constitutional right to present a defense by not allowing him to introduce evidence of the victim's prior theft, (3) that he received ineffective assistance of counsel, (4) that the prosecution violated his Fifth Amendment rights by commenting on his prior arrest silence, (5) that there was cumulative error depriving him of a fair trial, and (6) that the court erred in requiring him to pay the cost of postrelease supervision as a condition to his community custody. We agree that the trial court erred in requiring Mitchell to pay the cost of postrelease supervision as a condition to his community

Citations and pin cites are based on the Westlaw online version of the cited material.

custody, and remand to strike this cost from the judgment and sentence. We otherwise affirm.

## I. FACTS

The events in this matter occurred in early 2016 at an abandoned house at 21615 29th Ave. S., in Des Moines. The house played host to a variety of individuals and, aside from providing shelter, served as a location for the sale and use of drugs.

Residing in the house were spouses Raymond "Lucky" Carmona and Cristina Perez. Across the hall lived Walter Hester and, occasionally, Jennifer "Froggy" Reitan. Elsewhere in the house, George "GQ" Brown was fixing up a room for himself and his girlfriend, Hazel Jones. Many of the residents used drugs, including heroin and methamphetamine. Not residing in the house, but relevant to these events, were Kali Phillips-Means, Vanessa Martinez, and Ronald "Shorty" Mitchell, all of whom were friends or acquaintances of some of the house's residents.

Early morning on January 7, 2016, Perez and Phillips-Means went out to the local 7-Eleven. While there, the two encountered Mitchell. Mitchell was a heroin dealer, who had sold to Perez in the past. Perez returned to the house alone. When he returned, only Carmona and Brown were at the house. Shortly thereafter, Martinez showed up in a minivan. Brown let Martinez in and she began to prepare drugs for him because he was dopesick[1].

Shortly after, Mitchell arrived and knocked on the plywood covering one of the front windows. Brown answered the door to find Mitchell and began chastising him for

---

[1] "Dopesick" refers to symptoms of heroin withdrawal, which results in feeling ill, including vomiting.

knocking too loudly. Perez explained to Brown that Mitchell was there to sell drugs, which calmed Brown down. Mitchell entered the house and joined the others drinking while passing out sample packs of drugs.

According to Carmona, Brown and Mitchell began arguing about respect. Carmona heard the argument escalate, so he stepped away towards the door of the room. Carmona then heard a loud bang that sounded like a gunshot. Carmona walked away from the room, not looking back to see what transpired. As Mitchell left, he told Carmona and Martinez (who had entered the house to investigate the noise) to "be quiet." Everyone left the house, with Brown deceased on the futon in Carmona and Perez's room.

Mitchell testified to a different version of these events. According to Mitchell, he was selling heroin and storing the cash proceeds in his shoe. Brown asked to purchase $120 of heroin. While Mitchell was weighing out the heroin, Brown grabbed Mitchell's bag of drugs and struck him in the face with a pistol. Brown told Mitchell to take his shoes off (presumably to steal Mitchell's drug proceeds). After tussling, Mitchell rushed Brown, struck him over the head with a liquor bottle, and dislodged the pistol from his hands. Mitchell gained control of the pistol. Mitchell testified:

> So, I mean, if your hands are on the back of me, somebody is, I don't know if they're pushing or trying to grab me, my first thought—I can't even tell you—I thought to just shoot him.
>
> I—I think—to be honest with you, I think it must have had a hair trigger, because my thought process wasn't—I'm almost positive I didn't just, okay, I'm about to just pull the trigger.
>
> That joint had to have some kind of hair trigger or something, because when I swung it up, I was pushing him off me. And I think the panicking part was when somebody—I don't know if they were trying to pull me back

-3-

or push me back in the room. At that point, I'm like, I'm not going back in this room.

So, the gun [goes] off, boom; he spins away. I didn't think it hit him.

Mitchell left the house.

After a lengthy investigation, Mitchell was charged by information in October 2016 with murder in the second degree and unlawful possession of a firearm in the first degree.

Following trial, a jury found Mitchell guilty of murder in the second degree and unlawful possession of a firearm in the first degree. He was sentenced to 457months. Mitchell appeals.

## II. ANALYSIS

### A. Lesser Included Offense Instruction

Mitchell argues first that the trial court erred in denying his request for jury instructions on the lesser included offense of manslaughter in the second degree. We disagree.

A lesser included offense instruction is warranted if (1) each of the elements of the lesser offense is a necessary element of the offense charged (legal prong), and (2) the evidence in the case supports an inference that the lesser crime was committed (factual prong). State v. Tamalini, 134 Wn.2d 725, 728-29, 953 P.2d 450 (1998) (citing State v. Workman, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978)). We review a trial court's refusal to give an instruction based on the legal prong de novo, and based on the factual prong for an abuse of discretion. State v. Walker, 136 Wn.2d 767, 771-72, 966 P.2d 883 (1998).

Here, the legal prong asks if each of the elements of manslaughter in the second degree are necessary elements of murder in the second degree; the parties concede they are. "A person is guilty of manslaughter in the second degree when, with criminal negligence, he or she causes the death of another person." RCW 9A.32.070(1). "A person is guilty of murder in the second degree when: (a) with intent to cause the death of another person but without premeditation, he or she causes the death of such person or of a third person." RCW 9A.32.050. Because each of the elements of manslaughter in the second degree are necessary elements of murder in the second degree, we continue to the factual prong.

We review the supporting evidence at trial in the light most favorable to the party that requested the instruction. State v. Fernandez-Medina, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000). The lesser included instruction "should be administered if the evidence would permit a jury to rationally find a defendant guilty of the lesser offense and acquit him of the greater." Fernandez-Medina, 141 Wn.2d at 456. However, the "evidence must affirmatively establish the defendant's theory of the case—it is not enough that the jury might disbelieve the evidence pointing to guilt." Fernandez-Medina, 141 Wn.2d at 456.

A person is found guilty of manslaughter in the second degree when "with criminal negligence, he or she causes the death of another person." RCW 9A.32.070 (emphasis added). A person acts with negligence when "he or she fails to be aware of a substantial risk that a wrongful act may occur and his or her failure to be aware of a substantial risk includes a gross deviation from the standard of care that a reasonable person would exercise in the same situation." RCW 9A.08.010(1)(d).

-5-

Alternatively, a person is found guilty of murder in the second degree when "with intent to cause the death of another person but without premeditation, he or she causes the death of such person or of a third person." RCW 9A.32.050(1)(a) (emphasis added). A person acts with intent "when he or she acts with the objective or purpose to accomplish a result which constitutes a crime." RCW 9A.08.010(1)(a).

Here, the trial court found that the evidence in the case did not support an instruction for manslaughter in the second degree. It based this finding on Mitchell's own testimony. Mitchell testified it was an accident and that the gun must have had a "hair trigger," and that it just "went off" or, alternatively, that he shot Brown in self-defense. Mitchell also said that, "I thought to just shoot him." The trial court determined that, based on these statements, Mitchell did not act recklessly or negligently, but perhaps accidentally or in self-defense. As such, the court found that the lesser included offense instruction of manslaughter in the second degree was not warranted.

Mitchell's case is similar to State v. Huff, 76 Wn.2d 577, 458 P.2d 180 (1969). There, the defendant testified that upon entering her husband's bedroom, he had a gun in his hand. Huff, 76 Wn.2d at 578. She grabbed the gun to attempt to get it away from him and the gun went off. Huff, 76 Wn.2d at 578. The gunshot killed the husband and Huff was charged with murder in the first degree. Huff, 76 Wn.2d at 578. Huff appealed the trial court's denial of her request for a lesser included offense instruction of manslaughter. Huff, 76 Wn.2d at 580.

The Supreme Court affirmed the trial court's denial of the instruction, holding that an accidental shooting is not manslaughter. In doing so, they stated:

> The jury must conclude from the evidence either that the appellant intentionally shot the deceased, or, conclude from her own testimony, that the shooting was an accident incidental to her attempt to get possession of the gun. If the shooting was intentional, the appellant would be guilty of murder in the first degree or murder in the second degree, if there was no premeditation. The jury was so instructed. If the shooting was accidental, then the appellant should have been acquitted, and the jury was so instructed. There is no evidence indicating manslaughter, and under such circumstances a manslaughter instruction should not be given.

Huff, 76 Wn.2d at 580.

Here, similar to Huff, Mitchell testified that, as an alternative to self-defense, he accidentally shot Brown because the gun had a "hair trigger." Were this the case, Mitchell did not act intentionally or negligently. Rather, the homicide is excusable because it was an accident. Mitchell's testimony that the shooting was an accident does not support that he acted negligently, but accidentally; an accidental shooting is not manslaughter.

Mitchell relies on State v. Berlin, 133 Wn.2d 541, 551, 947 P.2d 700 (1997), to support his position that the trial court was required to give the requested jury instruction on manslaughter in the second degree. In Berlin, the State charged the defendant with murder in the second degree by the alternative means of intentional murder, and felony murder with assault in the second degree as the underlying felony. Berlin, 133 Wn.2d at 549. Berlin moved to compel the State to elect between the alternative means on the basis that second degree murder and second degree felony murder are two separate crimes, rather than alternative means of the same crime. Berlin, 133 Wn.2d at 549. The trial court denied the motion. Berlin, 133 Wn.2d at 549.

After denying the motion, the trial court instructed the jury on the elements of manslaughter in the first and second degree as lesser included crimes of murder in the

second degree. Berlin, 133 Wn.2d at 549. The jury found Berlin not guilty of murder in the second degree, but guilty of manslaughter in the first degree. Berlin, 133 Wn.2d at 549. The Court of Appeals "reluctantly concluded," based on decisions from the Washington Supreme Court, that manslaughter is not a lesser included offense of murder in the second degree. Berlin, 133 Wn.2d at 549.

Reversing the Court of Appeals, the Washington Supreme Court reemphasized the Workman test for determining if a lesser included offense instruction is warranted. Berlin, 133 Wn.2d at 551. The court held that each of the elements of manslaughter are present in second degree murder, and that the trial court did not err in its factual analysis and subsequent inclusion of the lesser included offense instruction. Berlin, 133 Wn.2d at 551. Mitchell cites this holding as a requirement that the trial court should have included the jury instruction for manslaughter in the second degree.

Berlin, however, does not in fact require that the trial court give the lesser included offense instruction, but rather that the trial court may use its discretion in determining whether the facts present a case that warrants the manslaughter instruction. The court in Berlin merely examined the trial court's application of the factual prong of the Workman test, holding that there was not an abuse of discretion. Berlin, 133 Wn.2d at 552. This holding does not demonstrate that the trial court must include the instruction.

Mitchell also relies on State v. Grier, 171 Wn.2d 17, 246 P.3d 1260 (2011), to support the lesser included instruction requirement. There, an extremely intoxicated defendant was handling a gun and accidentally discharged it, killing the victim. Grier, 171 Wn.2d at 21, 23. The State charged Grier with both intentional and felony murder

-8-

in the second degree. Grier, 171 Wn.2d at 25. Grier's attorney initially proposed the lesser included instructions of manslaughter in the first and second degree, but later withdrew them. Grier, 171 Wn.2d at 26. The issue on appeal was whether counsel was ineffective for failing to propose these instructions. Grier, 171 Wn.2d at 20.

The Supreme Court held that, although Grier may have been entitled to the instructions, counsel was not ineffective. Grier, 171 Wn.2d at 43. In doing so, the court stated that counsel's belief that an "all or nothing" approach was best did not result in ineffective assistance. Grier, 171 Wn.2d at 43. Stated differently, Grier's counsel reasoned that the lesser included offense introduced risk of jail time versus the possibility that the jury acquits her due to accident (an "all or nothing" approach).

Simply because the Grier court determined that the defendant may have been entitled to the instruction does not mandate the instruction in other instances, such as Mitchell's. Here, the trial court found that the instruction was inapplicable, leaving Mitchell with the "all or nothing" scenario presented in Grier. In addition, Mitchell wrestled the gun away from Brown, he was not "extremely intoxicated," and violently waving a firearm around. This contrast in behavior further confirms that the trial court did not abuse its discretion in determining that the manslaughter instruction was not warranted.

Finally, Washington case law addresses situations in which self-defense has risen to the level of criminal recklessness or negligence required to warrant an instruction of manslaughter. These situations, however, are readily distinguishable from Mitchell's.

In State v. Fluker, 5 Wn. App. 2d 374, 399, 425 P.3d 903 (2018), the jury was instructed on a lesser included offense of manslaughter in the first degree. There, an unarmed victim approached the defendant who reasonably believed he was in imminent danger. As a result, the defendant discharged his firearm 8 to 10 times at close range, which rose to the level of recklessness in use of the firearm. Similarly, in State v. Schaffer, the defendant, purportedly acting in self-defense, shot the victim five times— twice in the back and three times in the legs. 135 Wn.2d 355, 357, 957 P.2d 214 (1998). The court determined that these actions rose to the level of recklessness or negligence. Schaffer, 135 Wn.2d at 358. Last, in State v. Chambers, the victim, standing 9 or 10 feet away from the defendant, grabbed a shovel from his truck and held it "like a baseball bat." 197 Wn. App. 96, 104, 387 P.3d 1108 (2016). The defendant then shot and killed the victim. Chambers, 197 Wn. App. at 104. The court determined that, because of the distance the defendant was standing from the victim, and the amount of force used, the trial court could have reasonably found that he acted recklessly or negligently. Chambers, 197 Wn. App. at 121.

Each of these cases are in contrast to Mitchell's actions. In Mitchell's claimed self-defense, he wrestled the gun away from Brown and discharged it a single time into Brown's chest, resulting in his death. This is not comparable to shooting a victim 8 to 10 times at point-blank, shooting a victim twice in the back and three times in the legs, or shooting a victim threateningly holding a shovel from 9 to 10 feet away. As such, the trial court did not abuse its discretion when it found that Mitchell's actions did not rise to the level of criminal negligence.

In reviewing whether a lesser included offense instruction is warranted, it is undisputed that manslaughter in the second degree is a lesser included offense of murder in the second degree. The trial court, however, did not abuse its discretion in determining that Mitchell's actions did not rise to a level of criminal negligence, or denying him a lesser included offense instruction. First, an accidental shooting is not a negligent shooting. Second, a lesser included offense is not required if the facts do not warrant it. Finally, Mitchell was not drunkenly handling a firearm, but rather may have accidentally discharged one as part of a fight. The trial court did not err in not giving the requested instructions.

B. Excluded Evidence of Theft

Mitchell next asserts that the trial court violated his constitutional right to present a defense when it excluded evidence of a possible robbery at the house the day before Brown's death. We disagree.

During pretrial hearings, and repeatedly throughout the trial, Mitchell presented argument that on January 6, 2016, the day before the murder, Reitan brought a drunk Russian man to the abandoned house as a "trick," that he passed out, and that Reitan, Brown, and Perez took his wallet and split the $600 proceeds. The trial court excluded the evidence.

Mitchell argues that, by excluding evidence that Brown participated in a prior theft, the trial court violated his constitutional right to present a defense. Mitchell contends that this evidence was admissible under a common scheme or plan under ER 404(b) and, in the alternative, the State opened the door to the evidence when witnesses commented on Brown's good character. We disagree.

-11-

Appellate review of a trial court's exclusion of evidence involves two steps. State v. Clark, 187 Wn.2d 641, 648-49, 389 P.3d 462 (2017). First, we examine whether the trial court abused its discretion when excluding the evidence. Clark, 187 Wn.2d at 648-49. A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. State ex rel. Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). Second, when relevant defense evidence was excluded, we "determine as a matter of law whether the exclusion violated the constitutional right to present a defense." Clark, 187 Wn.2d at 648-49 (citing State v. Jones, 168 Wn.2d 713, 719, 230 P.2d 576 (2010)).

### 1. Common Scheme or Plan

As a preliminary matter, the State argues that Mitchell waived his argument that the evidence should be admitted as a common scheme or plan under ER 404(b) because he did not raise the argument at trial.

Generally, we will not consider issues raised for the first time on appeal. However, a "party may raise for the first time on appeal a manifest error affecting a constitutional right." In re Adoption of M.S.M.-P., 181 Wn. App. 301, 312, 325 P.2d 392 (2014) (citing RAP 2.5(a)(3)). The appellant has the burden of demonstrating the basis for reviewing an issue for the first time on appeal. State v. Grimes, 165 Wn. App. 172, 185-86, 267 P.2d 454 (2011). Here, Mitchell fails to address RAP 2.5(a) in his reply brief and offers no basis for reviewing his claim regarding a common scheme or plan under ER 404(b) for the first time on appeal. He has not met his burden.

2. "Open Door" Doctrine

Mitchell next argues that the evidence should have been admitted under the "open door" doctrine because evidence of Brown's good character was repeatedly put before the jury, and that they were likely left with an impression that he was a "drug addict with a heart of gold, always helping those around him and unlikely to be involved in a robbery."[2] Therefore, Mitchell argues, he should have been able to introduce evidence of the prior robbery to rebut the positive depiction of Brown's character.

As recently described in State v. Rushworth, 12 Wn. App. 2d 466, 473, 458 P.3d 1192 (2020):

> Put simply, the open door doctrine is a theory of expanded relevance. It permits a court to admit evidence on a topic that would normally be excluded for reasons of policy or undue prejudice when raised by the party who would ordinarily benefit from exclusion. The open door doctrine recognizes that a party can waive protection from a forbidden topic by broaching the subject. Should this happen, the opposing party is entitled to respond. As explained in Gefeller, "when a party opens up a subject of inquiry on direct or cross-examination, [the party] contemplates that the rules will permit cross-examination or redirect examination, as the case may be, within the scope of the examination in which the subject matter was first introduced."

(quoting State v. Gefeller, 76 Wn.2d 449, 455, 458 P.2d 17 (1969)). The open door doctrine does not, however, result in "automatic admissibility." Even if potentially relevant, the evidence "is still subject to possible exclusion based on constitutional requirements, pertinent statutes, and the rules of evidence." Rushworth, 12 Wn. App. 2d at 474.

---

[2] Perez testified that Brown was a "really good friend" and that he "looked out for [her], always made sure [she] was safe, never left [her] alone, made sure [she] ate, took care of [her]." Martinez described Brown as "very gentlemanly with [her]." McCarthy testified that Brown was a "good kid."

The trial court disagreed that the State had "opened the door" to character evidence. Notably, the trial court stated:

> I don't believe, or based on the evidence that I've heard, that the victim sounds like a good character, if you will. Basically, he's using drugs and doing everything everybody else is doing at that house. The Defense is asking me to allow a specific incident. I don't believe that's how this evidence would come in anyhow, under 404(b) as character evidence. So, having said that, I'm going to deny that request.

The trial court did not abuse its discretion when excluding evidence of the prior robbery under ER 404(b). The witnesses did not testify that Brown did not commit crimes or would not harm anybody—which might have opened the door to evidence of the prior bad act. The testimony that Brown was a "good kid" and "gentlemanly" did not create a false impression that he lived a crime free life, particularly in light of the extensive testimony about his homeless, drug-addicted lifestyle.

### 3. Constitutional Right to Present a Defense

Mitchell argues finally that the exclusion of evidence denied him of his constitutional right to present a defense. When a trial court excludes relevant evidence, appellate courts engage in de novo review of whether the exclusion violated the constitutional right to present a defense. Clark, 187 Wn.2d at 648-49.

Courts have held that a defendant has been denied the right to present a defense when the court excludes evidence actually related to the facts of the crime. In State v. Jones, 168 Wn.2d 713, 230 P.3d 576 (2010), the defendant who was charged with rape wanted to introduce evidence that on the night of the alleged rape, the victim had used alcohol and cocaine and engaged in consensual sex with other men, including the defendant, during a nine hour "alcohol-and-cocaine-fueled sex party." Jones, 168

Wn.2d at 717. The trial court excluded the evidence, citing the rape shield statute. Jones, 168 Wn.2d at 717-18. The Supreme Court reversed, holding that the evidence was "Jones's entire defense . . . if believed, would prove consent and would provide a defense to the charge of second degree rape." Jones, 168 Wn.2d at 721.

Here, the trial court excluded Mitchell from presenting evidence that Brown participated in a theft the day before. The trial court found that the evidence was not relevant to the murder, was improper propensity evidence, and that the State had not "opened the door" to the evidence. The trial court's rulings did not violate Mitchell's right to present his defense of self-defense, or his alternate theory that the gun had a hair trigger and fired accidentally. Mitchell was allowed to testify that Brown had tried to rob him at gunpoint and had been killed while Mitchell was defending himself. The exclusion of the theft evidence did not weaken that defense. The fact that Brown may have assisted in taking a wallet from an intoxicated man the night before did not corroborate Mitchell's need to act in self-defense the next day. Mitchell was permitted to testify on his behalf regarding both a lack of intent to kill Brown, as well as an accidental discharge of the firearm. The exclusion of the evidence did not deprive Mitchell of his ability to present a defense.

### C. Ineffective Assistance of Counsel

Mitchell next contends that he received ineffective assistance of counsel because his counsel delivered an opening statement that discredited his later testimony.

A claim of ineffective assistance of counsel presents a mixed question of fact and law that we review de novo. In re Pers. Restraint of Fleming, 142 Wn.2d 853, 865, 16 P.3d 610 (2001). A defendant claiming ineffective assistance of counsel has the burden

of establishing that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant's case. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. McFarland, 127 Wn.2d 322, 334 899 P.2d 1251 (1995). The inability to establish either prong is fatal to an ineffective assistance of counsel claim. Strickland, 466 U.S. at 700.

Counsel's performance is deficient if it falls below an objective standard of reasonableness. State v. Stenson, 132 Wn.2d 668, 705, 940 P.2d 1239 (1997). Our scrutiny of counsel's performance is highly deferential; we strongly presume the performance was reasonable. Grier, 171 Wn.2d at 33. "When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient." State v. Kyllo, 166 Wn.2d 856, 863, 215 P.3d 177 (2009). To establish prejudice, the defendant must demonstrate that but for the counsel's performance, the outcome would have been different. State v. McLean, 178 Wn. App. 236, 248, 313 P.2d 1181 (2013). If trial counsel's conduct is characterized as legitimate trial strategy or tactics, the conduct does not equate to ineffective assistance of counsel. State v. Yarbrough, 151 Wn. App. 66, 90, 210 P.3d 1029 (2009).

The pretrial omnibus order indicated that the defense was a general denial. Prior to opening statements, defense counsel asked whether the omnibus order could be amended to a general denial/self-defense in the event Mitchell chose to take the stand and raise self-defense. Because the defense had been a general denial without notice to the State of the possibility of self-defense, and because there was no evidence from any witness of self-defense, the trial court instructed counsel that self-defense could not

be raised in opening statements. The court recognized that if Mitchell did testify and did raise self-defense, that it would be addressed in jury instructions.

During opening statements, defense counsel adhered to the trial court's ruling and did not discuss self-defense—instead staying with the defense of a general denial. This included asserting that the State had no fingerprints or DNA evidence that would place Mitchell at the scene. On appeal, Mitchell argues counsel was ineffective because the opening statements undermined his credibility when he testified to self-defense.

We disagree for several reasons. First, there is no indication in the pretrial record that Mitchell actually planned to testify or raise self-defense. Second, defense counsel's opening statement complied with the trial court's ruling and avoided discussing self-defense. And finally, the statement that there was no DNA or fingerprints to prove Mitchell was even in the house was true. Defense counsel stayed with the defense of a general denial and attacked the forensics and investigation, a legitimate trial tactic. A legitimate trial tactic does not constitute ineffective assistance of counsel. See, e.g., Grier, 171 Wn.2d at 20 (holding that the defense counsel's "all or nothing" approach was a legitimate trial tactic and did not constitute ineffective assistance of counsel); In re Det. of Strand, 139 Wn. App. 904, 913, 16 P.3d 1195 (2007) (holding that a defendant's decision to later testify is a tactical decision and cannot be the basis for an ineffective assistance of counsel claim). Mitchell fails to demonstrate ineffective assistance of counsel.

D. Right to Silence

Mitchell next argues, for the first time on appeal, that the State violated his constitutional right to silence by commenting on his prior silence during closing argument. We disagree.

The Fifth Amendment and Article I, section 9 of the Washington Constitution prohibits the government from compelling a person to testify or give evidence against themselves. U.S. CONST. amend V; WASH. CONST. art I, § 9. The State may not make it costly to exercise this right by "'solemniz[ing] the silence of the accused into evidence against him.'" State v. Burke, 163 Wn.2d 204, 212, 181 P.3d 1 (2008) (quoting Griffin v. California, 380 U.S. 609, 614, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965)). Silence used as evidence of guilt is reversible constitutional error. State v. Terry, 181 Wn. App. 880, 891, 328 P.3d 932 (2014).

We review constitutional challenges de novo. State v. Evans, 177 Wn.2d 186, 191, 298 P.3d 724 (2013). Although Mitchell did not raise his constitutional concern below (normally resulting in waiver), RAP 2.5(a)(3) provides an exception for a "manifest error affecting a constitutional right." In order to establish a manifest constitutional error, Mitchell must demonstrate both an error of constitutional magnitude and that the error is manifest.

We first "look to the asserted claim and assess whether, if correct, it implicates a constitutional interest as compared to another form of trial error." State v. O'Hara, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). Where, as here, the claimed error raises a constitutional interest, we next determine if the error is manifest. "'Manifest' in RAP 2.5(a)(3) requires a showing of actual prejudice." State v. Kirkman, 159 Wn.2d 918,

935, 155 P.3d 125 (2007). "To demonstrate actual prejudice, there must be a 'plausible showing by the [appellant] that the asserted error had practical and identifiable consequences in the trial of the case.'" O'Hara, 167 Wn.2d at 99 (quoting Kirkman, 159 Wn.2d at 935).

The State argues that it used the cross-examination and closing arguments regarding Mitchell's prior silence solely for impeachment. A defendant's Fifth Amendment right is not violated when he takes the stand and his silence is used for the limited purposes of impeachment. Raffel v. United States, 271 U.S. 494, 46 S. Ct. 566, 70 L. Ed. 2d 1054 (1926) (holding that asking about the defendant's prior silence was proper); Jenkins v. Anderson, 447 U.S. 231, 232, 100 S. Ct. 2124, 65 L. Ed. 2d 86 (1980) (stating that cross-examination and statements in closing argument in regards to silence did not violate the defendant's Fifth Amendment rights). Therefore, the primary question on review is whether Mitchell's prior silence was used as evidence of guilt or used for impeachment.

During the State's cross-examination of Mitchell, the following occurred:

[STATE]: Okay. And, in fact, you admit shooting him; correct?

[MITCHELL]: Yes, I do.

[STATE]: All right. But you're saying it was in self-defense?

[MITCHELL]: That's for the legal people to decide. I'm just telling the jury, I don't know much about the law; I'm telling the jury what happened, and my lawyer asked me to get up here and explain to the jury what the facts are, and I'm just telling you what actually happened. And if that makes me a murderer or a self-defense or whatever it might be, that's for these people to decide. I don't know. But I'm just glad to be able to get it off my chest, and so I'm doing it; I'm telling these people exactly what happened.

[STATE]: You've never had a chance to get it off your chest before?

-19-

[MITCHELL]: My lawyer—what I mean is get it off my chest, let me explain.

[STATE] It was a yes or no question. You've never had the chance, other than through your lawyer?

[MITCHELL]: It ain't that simple, because it' my chest. It ain't on your chest; it's on my chest. So, since you asked me that question, if you're going to ask me, at least give me the opportunity to tell you.

[STATE]: Go ahead, Mr. Mitchell.

[MITCHELL]: I'm talking, because they're deciding this. What I mean by that is I've lived with it since it happened. I have. Here's the thing: The truth is this: I've slept good every night, because, in my mind, I was the victim.

Until very recently, I started thinking a little bit different about that, because I didn't murder this man. That's for you all to decide that. But I wasn't a real innocent, either. It wasn't like they came and got me from working 9:00 to 5:00 somewhere and had mistaken identity. So I was wrong in that part. That's a different type of wrong. That's the inside wrong. So, now, if I'm going to lose my life and I'm going to prison for the rest of my life, then I'm going to get it off my chest. And I got two dogs. I got two dogs, six grandchildren, and three children. I even volunteer sometimes giving out food. But I'm still a scumbag by the world's standards.

I'm not going to sit here and tell those people, you know, I'm a great guy. I'm not a great guy. I'm not. But I didn't go to that house with the intention on taking anybody's life or shooting anybody. That man walked with me to my truck. He knew I didn't have a gun.

And however this turns out, and, for you, however this turns out, I got a little bit of respect for you. You're a good lawyer. And you did give me an opportunity to do something different, then, what I'm doing here today, and I have to take advantage of that, because I don't think I was—I didn't think I was guilty of nothing.

[STATE]: So, again, Mr. Mitchell, you say you didn't have an opportunity to get this off your chest, yet you were asked about this incident not once, but twice by the detectives; correct?

[MITCHELL]: Yes.

[STATE]: Thank you. And you didn't get it off your chest, then; did you?

[MITCHELL]: Well, here's the thing about the detective: You live on one side of the street, I live on the other side of the street. I don't talk to the police without a representative.

I have been to prison a few times, and I ain't saying I was innocent, but there was times that things got spun on me. So I don't have a healthy— you know, trust for telling the police anything, because I don't know the law like that.

So, yeah, twice you're right, I didn't talk to them. And no matter how this turns out, the next time, if anything goes wrong with me, I'm probably never going to tell them anything or be willing to share anything with them unless I have proper understanding of representation, and that's my right to do so. And if that makes me guilty, then I guess I'm guilty.

[STATE]: And when they came to talk to you, you hadn't been arrested yet on this crime; correct?

[MITCHELL]: No.

[STATE]: All right. And so you decided it made more sense to let them arrest you, let you get charged, let you go through this process, be in trial, and then that's when you were going to get it off your chest?

[MITCHELL]: Okay. Yeah. Yeah. Yeah, I guess that's what it is. You're right.

Mitchell did not object to this questioning.

During closing argument, the prosecutor made the following reference to the exchange during cross-examination:

He'd been thinking about this ever since he was arrested, and it was a great relief to get it off his chest, even though he had been given several opportunities to do that prior to yesterday, when he sat on that witness stand and told you his story, his version of what happened on that day.

It appears that both the State's questions during cross-examination and its statement during closing argument were for impeachment. Mitchell chose to testify and

opened himself up to cross-examination. Mitchell stated that he just "wanted to get it off [his] chest." Such an answer invites the prosecutor to point out that Mitchell had prior opportunities to "get it off his chest." The prosecutor's use of Mitchell's responses were then used in closing argument to impeach Mitchell's credibility, not as substantive evidence of his guilt.

Moreover, even if the comment on Mitchell's silence was error, Mitchell cannot show that the asserted error had practical or identifiable consequences at trial. O'Hara, 167 Wn.2d at 99. Mitchell himself explained that he was not comfortable talking to or trusting police. His answer mitigated the fact that he had not previously chosen to tell police that he acted in self-defense. Moreover, the evidence against Mitchell was substantially based on the testimony of multiple witnesses about him being in the room with Brown when a shot was fired and then Brown was found deceased. The prosecutor's reference to Mitchell having prior opportunities to claim self-defense did not change the outcome of trial. Mitchell fails to demonstrate that these statements introduced actual prejudice rising to manifest constitutional error.

E. Cumulative Error

Mitchell next contends that cumulative error violated his right to a fair trial. Cumulative error may call for reversal, even if each error standing alone would be harmless. State v. Coe, 101 Wn.2d 772, 789, 684 P.2d 668 (1984). As discussed above, Mitchell has not demonstrated a single incident of error. As a result, his argument for cumulative error fails.

-22-

F.   Cost of Supervision During Community Custody

Mitchell finally argues that the trial court erred in requiring him to pay the cost of his supervision during community custody.  The State concedes that, because Mitchell was indigent, it was error for the trial court to impose the supervision cost.  We agree.

Discretionary legal financial obligations, including supervision fees, may not be imposed on a person who is indigent.  State v. Ramirez, 191 Wn.2d 732, 426 P.3d 714 (2018).  Here, the trial court expressly found Mitchell indigent at the time of sentencing.  Because the trial court found Mitchell indigent at the time of sentencing, we remand to the trial court to strike the postrelease supervision cost from the sentence and judgment.

Remanded to strike the cost of community custody supervision.  Affirmed in all other respects.

_Mann, C.J._

WE CONCUR:

_____          _Andrus, A.C.J._