# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 55212-4-II |
| Respondent, | |
| v. | |
| DARRY DAQUAN SMALLEY, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Darry D. Smalley appeals his convictions for first degree murder and three counts of first degree assault. Smalley argues that the trial court erred by denying his request for instructions on manslaughter as a lesser included offense of murder, there is insufficient evidence to support the jury's verdicts on first degree murder and one count of first degree assault, the trial court erred by giving the incorrect jury instruction on self-defense, the trial court erred by failing to follow GR 37, the trial court denied Smalley's right to present a defense, and there were multiple instances of prosecutorial misconduct. We affirm.

## FACTS

### A. BACKGROUND

On October 20, 2018, Natosha Jackson was bartending at a club in Lakewood, Washington. Some of Jackson's friends were having a birthday party in the VIP section of the club. Early in the morning on October 21, Jackson got into an argument with some men at the bar. Tired and frustrated, Jackson walked away from the bar. Jackson asked her friend, Perry Walls, to watch out for her because she was being disrespected by a group at the bar. Then Jackson went outside and

saw her boyfriend, Terrence King, and his friend, Denzel McIntyre, who had come to pick her up. Jackson went back into the club.

Inside the club, Walls confronted the group of men that Jackson had identified as being disrespectful to her. This group included Smalley, Dominique Avington, and Kenneth Davis. Some of Walls' friends from the party followed Walls over to the group. After a short verbal confrontation, punches were thrown, and both groups were involved in a short fight. The fight broke up and Smalley, Avington, and Davis left the club. Walls was still upset about the fight and followed them outside.

Outside the club, King recognized Walls and moved toward him. McIntyre followed King. Moments later, 30 shots were fired toward the club. King, Walls, McIntyre, and many other club patrons tried to rush back inside.

King was struck by two bullets in the back and died inside the club. Walls was shot in the foot. McIntryre was shot in the buttocks. Pearl Hendricks, a woman who was running back inside the club, was shot four times, twice in the back. Hendricks was left permanently paralyzed from the chest down.

The State charged Smalley with one count of first degree murder for King's death. The State also charged Smalley with three counts of first degree assault for the injuries to Walls, McIntyre, and Hendricks. The State charged Smalley as both a principle and accomplice. Later, the State amended the information to include an alternative count of second degree murder for King's death. The State also alleged the aggravating circumstance that the crime involved a destructive and foreseeable impact on persons other than the victim. Avington and Davis were also charged, and they were set to be tried jointly with Smalley.

No. 55212-4-II

B.      EXCUSAL OF JUROR 32

The State exercised its first peremptory challenge to excuse juror 32. Avington, Smalley's

co-defendant, objected to the excusal of juror 32 under GR 37. The trial court observed that juror

32 did not appear to be a person of color or a minority. Avington explained:

> [T]o my eye she appeared to be mixed with something, whether it was—it may
> have been native. Just from looking, I guess looking at the hair color, her skin was
> a little bit darker, whether that was tan or natural melanin. I think she was a
> minority or part of a minority group, racial or ethnic minority as provided in GR
> 37, and so that's why I stated the GR 37 objection to Juror No. 32.

6 Verbatim Report of Proceedings (VRP) at 932-33. The State argued that GR 37 did not apply

because juror 32 did not appear to be "anything other than white as snow," and "just white as the

day is long."[1] 6 VRP at 933. When given the opportunity to offer input, Smalley stated:

> I believe that she is of part minority. I didn't see her in the way [the State] did, that
> was white as the day is long. I've not heard that phrase, but I didn't see her that
> way. I thought that she may have been of some mixed race, but it would have been
> a small percentage at most.
>       And I don't know how to weigh that out, but we had a conversation and
> [Avington's counsel] says "you know, I really believe that she's of mixed race."
> And so, you know, I take his observations, and he's been a lawyer for some period
> of time and has good insight into people, and he managed to speak to her and he
> felt that she was of mixed race and he made that objection. So I don't know who
> makes that finding. I don't know who makes that finding. I don't know how we
> make a test on it.

6 VRP at 934-35.

The trial court noted that it was required to apply GR 37, but there was no guidance on

how to determine whether someone is a racial or ethnic minority. Based on appearances and name,

the trial court identified six jurors it believed were racial or ethnic minorities, which did not include

---

[1] We are dismayed at the State's choice of words and caution against using such language.

3

juror 32. There is nothing in the record that indicates juror 32's race or ethnicity, and the trial court did not identify juror 32 as a racial or ethnic minority. The trial court granted the State's peremptory challenge and dismissed juror 32.

## C.    TRIAL

Prior to trial, all three defendants moved to exclude any gang evidence. During the motion hearing, the State offered to withdraw the gang evidence if the defendants would stipulate to their identities as the shooters and rely on self-defense. The defendants agreed to the State's suggestion, and the State agreed to sanitize any reference to gang related evidence.

The parties entered a comprehensive written stipulation identifying the defendants, as well as several other people, in various surveillance videos used as trial evidence. The stipulation included several screen shots from the surveillance videos which the defendants stipulated were pictures of Smalley and Avington firing multiple rounds from semi-automatic handguns.

The trial court admitted the stipulation into evidence. Jackson, Walls, and McIntyre testified to the background facts above. Jackson explained that she told Walls, "'I need you to watch my back tonight,'" because people were being disrespectful. 9 VRP at 1381. Walls asked her who he should watch out for, and Jackson indicated the group by the bar. When reviewing surveillance video during her testimony, Jackson remembered that she had returned to working behind the bar for a few minutes before the fight broke out in the club.

Walls explained that after Jackson told him she was being disrespected, he went over to the bar and "made a general announcement" asking who was being disrespectful. 11 VRP at 1725. Nobody responded. A few minutes later, the group was "getting riled up" and looked to be "squaring off" to fight. 11 VRP at 1727. Walls began pulling up his pants, preparing for a fight,

and got blind-sided by a punch. Walls explained that the fight moved outside the club as people were pushed out the door. Walls went outside and continued arguing with the guys outside. While Walls was arguing, he heard shots fired, ran inside, and fell. Inside the club, Walls realized he had been shot in the foot. Walls testified that he never had a firearm in his possession.

Detective Jeff Martin of the Lakewood Police Department was assigned as the lead detective to investigate the shooting at the club. Based on forensic examination of fired shell casings at the scene, Detective Martin determined there were three shooters firing from three areas. In total, forensics collected 30 shell casings from outside the club. Six shell casings were .40 caliber shell casings found at the corner of the adjacent grocery store. Seventeen 9mm shell casings were found partially intermixed with the .40 caliber shell casings. Another seven shell casings were found in the parking spaces east of the grocery store. Although forensics was able to identify fired shell casings at the scene, forensics only examined one bullet that struck a victim— specifically, one of the bullets that struck King in the back. The bullet could have been a 9 mm, but was definitely not a .40 caliber bullet. Through his investigation, Detective Martin also identified Avington, Smalley, and Davis as part of a group that had been together at a different club before going to the club in Lakewood.

Later in the investigation, a firearm that was purchased for Smalley was recovered at Redondo Beach. The investigation also showed that a friend of Smalley's, who was on GPS monitoring for parole, was at Redondo Beach after the shooting.

Following the shooting, Smalley fled to Hawaii, where he was arrested. At the time of his arrest, Smalley was carrying identification and bank card belonging to another person.

1.      Johnson's Testimony

Erica Johnson testified that Smalley is her fiancé's cousin and she had known him for about seven or eight years.  Smalley often stayed at Johnson's house several times a week.  In October 2018, Johnson purchased a firearm for Smalley.  And in January 2020, Johnson pleaded guilty to the federal offense of causing the sale of firearm without a background check.  Johnson had purchased for Smalley a total of three or four guns, including a Ruger 9mm pistol.

Johnson also testified that Smalley had been at her home the morning after the shooting. While at the house, Johnson heard Smalley was talking to Johnson's fiancé about what had happened the night before.  Johnson also heard Smalley say that he called a girl a "bitch," the girl called someone over, and a fight broke out.  12 VRP at 1882.  Johnson did not remember hearing Smalley saying anything else about a shooting while at her home.

Johnson had been interviewed several times by federal authorities, as well as by detectives, prosecutors, and defense attorneys.  The State confronted Johnson with statements she had made during the interviews in which she stated that she overheard Smalley say that he also fired shots from the parking lot.  Johnson testified that she had told federal authorities that Smalley was bragging about the shooting.[2]  However, later in her trial testimony, Johnson denied Smalley made

---

[2] Specifically, Johnson testified as follows:

> [STATE:]      Do you remember also telling federal authorities that when
>               [Smalley] was confessing to the shooting, he was bragging about
>               it?
> [JOHNSON:]  And I believe I had clarified that just Tuesday, and I didn't use the
>               proper words.  It was more like amped up, if you remember that.
> [STATE:]      So initially you told federal authorities that [Smalley] was bragging
>               about this shooting, correct?
> [JOHNSON:]  Yeah.

6

the statements, claimed that she did not remember, and stated that she was only telling authorities what they wanted to hear.

Smalley cross-examined Johnson regarding her statements to federal authorities. Smalley had Johnson clarify that originally her statements had been focused on the gun purchases and it was only immediately prior to trial that the State began asking her questions related to Smalley's behavior the morning after the shooting. Smalley then cross-examined Johnson on her observations of Smalley when he was at her house the morning after the shooting. Johnson clarified that she used the wrong word when she said Smalley was "bragging." 12 VRP at 1913. Rather, she meant Smalley "'was really affected by it; he was really nervous by it; he was really amped up.'" 12 VRP at 1913. Neither Avington nor Davis cross-examined Johnson.

After cross-examination was completed, the State addressed the trial court without the jury present. The State requested permission to ask Johnson about threats that had been made against her for testifying. The trial court determined that it was clear that Johnson had "been deliberately evasive, unwilling to answer questions, especially questions put to her by the prosecutor." 12 VRP at 1920. The trial court thought it was important for the jury to hear a potential explanation for why the witness may have changed her story repeatedly throughout her testimony. The trial court ruled that a limited inquiry into the threats was appropriate with a limiting instruction, and trial court cautioned the parties to avoid any reference to gangs.

Johnson then testified that, before she was called to testify as a witness at trial, her fiancé told her that if she testified "people would be out to get" them and their family. 12 VRP at 1935.

_____

14 VRP at 1896-97.

Johnson was told that "if [she] were to testify, [her fiancé] would be greenlighted, shot, killed, and whoever is in the way of them trying to get to him will be shot and killed as well." 12 VRP at 1935. On recross-examination, Smalley had Johnson clarify that no threat was made directly to Johnson. Further, Johnson denied that the threat affected her testimony. Both Avington's and Davis' recross-examination focused on the fact that Johnson did not know Avington or Davis. The State offered a brief re-redirect. Smalley attempted to again cross-examine Johnson based on Avington's and Davis' recross-examination. The trial court would not allow Smalley to further recross-examine Johnson based on the co-defendants' questions, and Johnson was excused.

Later in the trial, Smalley moved to recall Johnson. Smalley explained that he had recently received the redacted proffer from the U.S. Attorney's Office regarding Johnson's statement, which indicated Johnson said, "[Smalley] seemed like he was kind of bragging." 14 VRP at 2283. Smalley claimed that this was a different from what she said on the stand. Smalley also wanted Johnson to clarify whether Smalley knew that King had died or others had been shot at the time she overheard his statements. Finally, Smalley wanted to ask Johnson if she believed that Smalley would have threatened her.

The trial court noted that Johnson had provided extensive testimony about whether Smalley had been bragging and whether Smalley knew that people had been shot at the time Johnson overheard him. The trial court expressed concern that further questioning regarding the potential source of the alleged threat would open the door to the gang evidence that had been excluded. The trial court denied Smalley's request to recall Johnson.

2.  Smalley's and Avington's Testimony

Smalley and Avington testified in their own defense. They both testified that they were friends. Avington explained that he had known Smalley for years. Although neither of them intended to meet the night of the shooting, they ended up at the same club earlier in the night. Then the entire group went to the club in Lakewood.

Smalley testified that while they were at the club, Walls started yelling at and threatening Smalley's group. Smalley recognized that the confrontation was turning into an argument and people in both groups were getting ready to fight. Smalley was trying to stay out of the fight. One of Walls' friends threw a punch that did not hit anyone, and the fight erupted.

During the fight, Smalley was grabbed and thrown to the ground. The man who slammed Smalley to the ground ran out the door. Smalley believed the man went to get a gun, so Smalley tried to get out of the club. Smalley ran out into the parking lot to his car and grabbed his gun from the passenger door. As Smalley headed back toward the club, he saw Avington outside in an aggressive confrontation with Walls. Although the confrontation appeared aggressive, Smalley could not hear any words being spoken. Smalley also saw two other men behind Walls that Smalley believed were involved in the confrontation.

Smalley testified that during the confrontation outside, Walls displayed a firearm. As soon as Walls showed his firearm, Smalley began firing. Smalley testified that Walls' firearm was a black, semi-automatic. When Smalley saw Walls' firearm, he was scared that Walls would shoot him or Avington. Smalley felt that

> if I let [Walls] pull that gun out, then not just my life but my friend's life is in danger
> and that we will be shot, so I shoot first.

9

15 VRP at 2375. Avington also started shooting at the same time, but Smalley claimed that there was no communication between them before the shooting began.

Smalley admitted that he believed he shot King, although he was not sure who shot Hendricks because there were three people shooting. Smalley also admitted that he was shooting at Walls. Smalley testified that he fired 16 or 17 times at Walls, King, and McIntyre.

After the shooting, Smalley spent the night at a hotel. In the morning, he stopped at a gas station and gave his firearm to a friend. Smalley did not see the firearm after that. Smalley then went to Johnson's house around 7:30 in the morning. Several days later, after learning that one person at the club had been killed and three others had been shot, Smalley bought a friend's identification and debit card. Then Smalley traveled through California to Hawaii.

Avington testified that he had a .40 caliber firearm with him and brought it inside the club. While at the bar, Walls confronted Avington's group and a fight started. Avington then left the club.

Avington also testified that Walls confronted him outside the club. According to Avington, Walls threatened to kill him, pulled up his shirt, and displayed a firearm. Avington stated that he fired only to scare Walls and to keep Walls from shooting at him. Avington specifically testified that he fired high and to the right. Avington claimed that he purposefully shot away from all of the people. Avington admitted his rounds could have struck the club, but that they could not have struck people. Avington explained that he only wanted to scare Walls away from him.

3.      Motion to Dismiss

After the defendants testified, Smalley filed a motion to dismiss based on prosecutorial misconduct during Smalley's cross-examination, arguing that the prosecutor repeatedly engaged with Smalley in "an aggressive, dismissive, and demeaning manner." Clerk's Papers (CP) at 225. Smalley also argued that the prosecutors acted to deliberately enflame the passions of the jury by having Smalley narrate the surveillance video showing Hendricks injured on the ground while being asked questions about whether the video showed Walls having a gun.

The trial court found that the prosecutor's cross-examination was appropriately aggressive—no more aggressive than the defense counsel's cross-examination of State witnesses. And the trial court specifically found that the prosecutor's cross-examination was not dismissive or demeaning. The trial court also found that the cross-examination of the video was appropriate because it was in response to Smalley's direct testimony. And the trial court found that the prosecutor did not ask rhetorical questions in order to inject his personal opinion into the cross-examination. The trial court explicitly stated, "I am not finding any misconduct by the prosecutor during this cross-examination, none whatsoever." 17 VRP at 2535. The trial court denied the motion to dismiss.

4.      Snapchat Videos

After the trial court admitted certain videos, Smalley's counsel notified the trial court that he had seen a gang sign in one of the snapchat videos from Avington's phone. Smalley moved to excise the portion of the video that showed the gang sign. Smalley's counsel admitted he did not see a gang sign in the video, but Smalley had recognized it and informed him it was in the video. Smalley's counsel also stated, "I'm sure the State didn't see it; the State would not have offered it

had it known there was a gang sign thrown up in there." 14 VRP at 2272. The defense attorneys admitted that they had not actually watched all the videos that the State provided in discovery a year and a half earlier. The trial court determined that it had not actually been established that the video contained any gang signs. Further, the trial court wanted to know if it was plausible to have the video altered to remove the alleged gang sign from the video. The trial court deferred its ruling.

The next morning, the trial court revisited the issue of gang signs in the Snapchat videos. However, the trial court ultimately decided to defer its ruling again in order to continue presenting evidence to the jury.

Later, the State argued that it did not know that any of the hand gestures in the video were gang signs and there was no evidence that the hand gestures were gang signs. At this point, Smalley's attorney claimed that the prosecutors must have known that the videos contained gang signs because they were experienced gang prosecutors. Both prosecutors told the trial court that they did not recognize the hand gestures as gang signs. During the discussion about the snapchat videos, the trial court explicitly stated that it did "not conclude that any lawyer in this case is trying to inject gang-related evidence into this case deliberately." 16 VRP at 2520. The trial court ruled:

> I am not convinced that this is in any way unfairly prejudicial. I am not convinced that any juror would leap to the conclusion that defense counsel fear in this instance. I am denying the request, the motion to direct the State to redact these items of evidence that have already been admitted.
> I'm going to order that no attorney is to make any reference to whatever hand signs are put up there in these Snapchat videos or to that portion of the video inside the bar where it appears that Mr. Walls and his companion are putting up some kind of hand sign gestures. There's not going to be any reference to that in argument by any attorney. That is the order of the Court.

16 VRP at 2526.

5.      Surveillance Videos

Videos from the surveillance system at the club, as well as surveillance videos from a neighboring business, were admitted into evidence.

Video of the front entrance area of the club shows the fight getting pushed outside, while Walls and others continued yelling and posturing at the entrance of the club. As they are leaving, Smalley and Avington are shown in the front entrance of the club standing so close together their shoulders are touching and their heads are close together.[3] The pushing and shoving continued before Walls exited the club. Less than a minute after Walls exited the club, the shooting began.

Video outside the club shows Avington and Smalley leaving the club at the same time. As they exit the club, Smalley appears to bump Avington's chest with his hand before running into the parking lot. Avington remains at the entrance of the club where it appears the altercation continues with people still inside the entrance of the club. Avington and others move away from the club entrance and into the parking lot as Walls exits the club. Walls is then on the video for the entire time leading up to the shooting, and the video shows both of Walls' arms are at his side the entire time. As soon as the shooting starts, Walls turns and runs back into the club. Smalley and Avington are not in the frame of this video when the shooting occurs.

However, a surveillance video from a neighboring business shows Smalley and Avington at the time of the shooting. Avington stipulated that a screenshot from the video showed him firing multiple bullets while standing square, facing forward with his arm almost parallel to the ground and pointing forward. The surveillance video also shows Avington in this stance firing multiple

---

[3] There is no audio in the surveillance video.

bullets at the entrance of the club. Smalley is to Avington's left, standing slightly behind him. The video shows that after the shooting, Avington and Smalley ran away in the same direction.

6.      Jury Instructions

Smalley proposed instructions on self-defense for both the murder charges and the assault charges. Smalley's proposed self-defense instruction for the assault charges stated:

> A person is entitled to act on appearances in defending himself or another, if that person believes in good faith and on reasonable grounds that he or another is in actual danger of injury, although it afterwards might develop that the person was mistaken as to the extent of the danger. Actual danger is not necessary for the use of force to be lawful.

CP at 182. Smalley proposed a similar self-defense instruction for the murder charges, but the instruction stating that a person is entitled to act on appearance of defending himself as it related to self-defense for the murder charges stated that a person must believe there is actual danger of "great personal injury," which is a higher standard than the assault self-defense instruction where the person must believe there is only an actual danger of "injury." CP at 184.

The trial court conducted off-the-record discussions of the jury instructions. But the trial court took exceptions to the court's instructions on the record. Smalley did not take exception to any of the self-defense instructions. Smalley also did not take exception to the trial court not including Smalley's proposed instruction regarding the right to act on appearances of defending from injury.

Smalley also proposed jury instructions for first degree manslaughter as a lesser included offense. After an off the record discussion on jury instructions, Smalley took exception to the trial court's refusal to instruct the jury on the lesser included offense of first degree manslaughter.

The trial court provided an extensive ruling on its decision to not include the lesser included offense instruction. The trial court went through multiple factors that supported the decision to deny the lesser included offense instruction, including: (1) there was video of the shooting rather than only conflicting eyewitness testimony, (2) there were approximately 25 people in the unobstructed line of fire, (3) most of the 30 shots that were fired landed very close to people and 8 shots actually struck people, (4) the distance from where Smalley and Avington were firing was estimated 35 feet to Walls and 60 feet to the door of the club, and (5) the physical evidence demonstrated that the shots were directed toward the crowd rather than fired erratically. Ultimately, the trial court concluded that the jury could not rationally conclude that only first degree manslaughter was committed.

7.      Closing Arguments

The State argued that Smalley, Avington, and Davis were acting as accomplices because all three were working together from the beginning of the fight in the club and had the same objective and mindset. The State's theory of the case was that all three defendants chose to act together to "make a statement." 18 VRP at 2658. The State pointed out that after they made this statement, they fled and hid, and it took months for law enforcement to locate them. 18 VRP 2714. The State referenced that finding the defendants was "[g]reat police work." 18 VRP at 2714. The State also went on to argue, "This self-defense claim is preposterous considering the outstanding law enforcement work on identifying them." 18 VRP at 2714.

The State also argued that the defendants failed to prove that they acted in self-defense. The State contended that the defendants initially claimed identity as a defense but had to switch their defense to self-defense: "The reality is, the defendants' initial defense must have been

15

identity, what we call identity; 'it wasn't me.'" 18 VRP at 2660. However, once the defendant's learned that there were multiple videos showing their participation in the crime they "had to switch to plan B, self-defense." 18 VRP at 2661.

The State went on to argue that there was no evidence to support the claim of self-defense because Walls did not have a gun and Walls did not threaten anyone. The State also argued that there is no evidence that Walls made any specific and deadly threat to support self-defense. The State then went on to discuss in detail the evidence it believed showed that Walls had no gun and was not a threat to the defendants. The State argued that the video evidence showed that Smalley, Avington, and Davis were preparing for the shooting before Walls even exited the club. And the State argued that the defendants' actions and body language show they were intending to shoot toward the entire crowd at the club rather than trying to specifically defend themselves against Walls. The State also reviewed the defendant's testimony in detail to show that it did not support the claim of self-defense. The State then argued that, even if the first shot that the defendants fired was justified, Smalley had no "excuse" for the other 16 shots. 18 VRP at 2852-53.

In rebuttal argument, prior to getting into the substance of the case, the State acknowledged the roles the attorneys played in the case. The State emphasized that a person charged with a crime is entitled to have an attorney to protect their rights and advocate for their best interests.

The State also discussed its burden of proof. The State argued that failing to hold the State to its burden of proof and convicting a defendant when the State did not prove all the required elements would be a miscarriage of justice. The State then asserted the converse was also true, if the "State proves all four elements of the crime, but because there are other things you don't know for certain, because there's some fifth or sixth thing that's unanswered or that's not clear, you find

16

the defendant's not guilty. That's a miscarriage of justice, too." 18 VRP at 2833. The State

recognized that beyond a reasonable doubt was a difficult concept that is not encountered in daily

decision making. The prosecutor offered an analogy to help explain the concept of reasonable

doubt:

> Let me offer an analogy for you that may make sense and may be helpful, and that's to consider it in the way you do a puzzle . . . . You sit down and put that puzzle together, and you might find as you go along that there are pieces of the puzzle you don't know what to do with and so you set them aside; you can't find the right place for them.
> There are pieces of the puzzle that are broken or warped, chipped, cracked, whatever. There are pieces of the puzzle that maybe they were gone before you even sat down, and nevertheless, if you have enough pieces of the puzzle there will come a point at which, and it's personal for each of you, there will come a point at which you are certain as to the image you are seeing despite the fact that there are warps in the puzzle pieces, despite the fact that you have missing pieces.
> Now think of a trial in much the same way. You are given pieces of evidence like pieces of a puzzle. Some of those pieces of evidence you may not know what to do with. Maybe it's one thing a witness said. Maybe it's everything a witness said, and so you set that piece aside. Maybe there are pieces of evidence that have warps or cracks or chips, but you can still put them into their place. Maybe there are pieces of evidence that you could conjure up as having existed somewhere out in the ether that just were never presented to you, like those missing puzzle pieces.
> And the question for you all as jurors is—and, again, it's a personal decision for each of you—the question is whether you have enough pieces of evidence warps and all, holes and all, with what you put into place, does it meet the elements of the crime and are you confident beyond a reasonable doubt as to the image you are seeing. I offer that as an analogy as you move forward.

18 VRP at 2835-36.

The State again engaged in an extensive discussion of the evidence that Walls did not have

a gun and the defendants raised self-defense when it was clear that they were involved in the

shooting. The State also clarified the burden of proof:

> This is important, too. These defendants when they testified—or, sorry— these defendants have no burden of proof. Let's be clear about that. If you choose

17

to put on a case, that's your right. If you choose not to put on a case, that's your right. If you don't put on a case, like for example Mr. Davis, you can't hold that against Mr. Davis. You have a right to remain silent, so on and so forth. The burden does at all times remain with the State.

18 VRP at 2881. The State went on to argue that when a defendant does put on a case, the State is able to question the evidence and the defense presented, including asking why certain witnesses did not testify. The State further argued:

You heard from [a defense counsel] why the State didn't call Mr. Cooper or Mr. Legend or any of these people. Because they never would have told you the truth. They never would have said: "You know what? I love these guys, but, yeah, what they did wasn't appropriate; what they did was just malicious." And so you're not going to get those witnesses. But if those witnesses who are tight, as you heard from these defendants, are tight with these defendants, where are they to back up what they're saying? That's not burden shifting. That's simply assessing the credibility of what they have to say.

VRP at 2882-83. Smalley objected and the objection was overruled.

D.    VERDICTS AND SENTENCING

The jury found Smalley guilty of first degree murder, second degree murder, and three counts of first degree assault. The jury also found that Smalley or an accomplice was armed with a firearm for all offenses. The jury further found that the State proved aggravating circumstances on all charges. The jury entered the same verdicts against Avington. The jury found Davis not guilty of all charges.

At Smalley's sentencing, the trial court dismissed the second degree murder charge to prevent a double jeopardy violation with the conviction for first degree murder. The trial court determined that a standard range sentence was appropriate despite the jury's findings on aggravating circumstances. The trial court imposed a high end range sentence on each count. The trial court also imposed the mandatory firearm sentencing enhancements. All terms of

18

confinement were ordered to be served consecutively because all charges were serious violent offenses. Smalley was sentenced to a total of 929 month's total confinement.

Smalley appeals.

## ANALYSIS

A.    LESSER INCLUDED OFFENSE

Smalley argues that the trial court erred by refusing to instruct the jury on manslaughter as a lesser included offense for first degree murder.[4]  We disagree.

A defendant has a statutory right to have the jury instructed on a lesser included offense. *State v. Condon*, 182 Wn.2d 307, 316, 343 P.3d 357 (2015); RCW 10.61.006.[5]  Since 1978, Washington courts have used the two-pronged test in *State v. Workman* to determine whether a defendant is entitled to an instruction on a lesser included offense:

---

[4]  Smalley also argues that he was entitled to an instruction on the lesser included offense of first degree manslaughter because, from the evidence, the jury could find that Smalley reasonably believed that he needed to act in self-defense but recklessly used more force than was warranted. Smalley raises this argument for the first time on appeal.

Under RAP 2.5(a), we may refuse to consider arguments raised for the first time on appeal. Although Smalley objected to the trial court's decision to decline the first degree manslaughter instruction, he did not argue that he was entitled to the instruction because he recklessly used more force than necessary to defend himself.  And the trial court's ruling was not based, in any way, on the theory that a first degree manslaughter instruction was appropriate because the use of force was recklessly more than necessary.  Further, Smalley does not address RAP 2.5(a)(3) or any exception to waiver in his briefing.  *See State v. Cox*, 109 Wn. App. 937, 943, 38 P.3d 371 (2002) (when an appellant fails to provide argument or authority, this court is not "required to construct an argument on behalf of appellants").  Therefore, we decline to consider Smalley's argument raised for the first time on appeal that the trial court should have given the lesser included offense instructions because he recklessly used more force than necessary in self-defense.

[5]  RCW 10.61.006 states, "In all other cases the defendant may be found guilty of an offense the commission of which is necessarily included within that with which he or she is charged in the indictment or information."

Under the Washington rule, a defendant is entitled to an instruction on a lesser included offense if two conditions are met. First, each of the elements of the lesser offense must be a necessary element of the offense charged [legal prong]. Second, the evidence in the case must support an inference that the lesser crime was committed [factual prong].

90 Wn.2d 443, 447-48, 584 P.2d 382 (1978) (citations omitted). Although *Workman* is the well-established test for determining whether a defendant is entitled to an instruction on a lesser included offense, our Supreme Court has recently recognized that some of the cases interpreting the *Workman* test have caused some confusion regarding the second prong (the factual prong) of the *Workman* test—specifically, the language in *State v. Fernandez-Medina*.[6] *State v. Coryell*, 197 Wn.2d 397, 415, 483 P.3d 98 (2021).

In *Fernandez-Medina*, our supreme court explained the application of the factual prong of the *Workman* test as follows:

The purpose of this test is to ensure that there is evidence to support the giving of the requested instruction. If interpreted too literally, though, the factual test would impose a redundant and unnecessary requirement because all jury instructions must be supported by sufficient evidence. Necessarily, then, the factual test includes a requirement that there be a factual showing more particularized than that required for other jury instructions. Specifically, we have held that the evidence must raise an inference that *only* the lesser included/inferior degree offense was committed to the exclusion of the charged offense.

141 Wn.2d at 455 (citation omitted). Although not incorrect, our Supreme Court has recognized that this language has resulted in courts weighing evidence and mistakenly believing that evidence is required to show that the greater charged crime was not committed. *Coryell*, 197 Wn.2d at 414-15. Thus, our Supreme Court clarified that "[i]mplicit within *Workman*'s reasoning is the idea that

---

[6] *State v. Fernandez-Medina*, 141 Wn.2d 448, 6 P.3d 1150 (2000).

when there is affirmative evidence from which the *jury* could conclude that only the lesser included offense occurred, a lesser offense instruction should be given." *Id.* at 414.

*Coryell* also clarified that conflicts in evidence are questions of fact for the jury, not the trial court. *Id.* It is improper for the trial court to weigh evidence when ruling on jury instructions. *Id.* at 415. If the trial court's decision on a lesser included offense instruction is based on a factual determination, we review the decision for an abuse of discretion. *Id.* at 405.

First degree murder by extreme indifference requires that a person act with extreme indifference, an aggravated form of recklessness, which creates a grave risk of death to others, and caused the death of a person. RCW 9A.32.030(1)(b). On the other hand, first degree manslaughter requires that a person recklessly caused the death of another. RCW 9A.32.060(1)(a). A person "acts recklessly when he or she knows of and disregards a substantial risk that a wrongful act may occur and his or her disregard of such substantial risk is a gross deviation from conduct that a reasonable person would exercise in the same situation." RCW 9A.08.010(1)(c).

Case law shows that a defendant charged with first degree murder is entitled to a first degree manslaughter instruction if there is some evidence that the defendant shot at an object rather than at a group of people. *See State v. Henderson*, 182 Wn.2d 734, 745-46, 344 P.3d 1207 (2015); *In re Pers. Restraint of Sandoval*, 189 Wn.2d 811, 823, 408 P.3d 675 (2018). For example, in *Henderson*, the defendant fired several shots toward a house party and our Supreme Court held that a rational jury could have found that the defendant acted with recklessness because of

> (1) testimony from the party's hosts that only three people were outside the house at the time of the shooting, (2) police testimony that no bullets or bullet strikes were found inside the house, where the majority of the partygoers were located, (3) the fact that most of the shots hit the side of the house or cars on the street and did not

appear to land near people, and (4) testimony that Henderson shot from the street rather than closer to the house.

182 Wn.2d at 745. Based on this evidence, our supreme court determined that "the jury could have concluded that Henderson intended to scare those in the house by erratically firing his gun rather than aiming at the security people in the yard." *Id*. at 745-46. Our Supreme Court applied the same reasoning in *Sandoval*, where the defendant was charged as an accomplice for a drive-by shooting of a van. 189 Wn.2d at 822-23.

Here, Smalley specifically testified that he shot directly toward Walls, McIntyre, and King, who were standing in a crowd of people at the entrance of the club. And Smalley testified that he shot King. Smalley's shots actually hit people and many bullets struck near to people even if they did not hit people. Smalley's own testimony established that he intentionally fired toward a crowd of people, rather than erratically toward the building or another object. Therefore, the evidence established that Smalley did not erratically fire toward an object, but rather specifically fired toward a crowd of people outside of the club. Because Smalley specifically fired toward a crowd, there was no evidence that would allow a reasonable jury to infer that Smalley only committed manslaughter. Accordingly, the trial court properly denied Smalley's request for an instruction on manslaughter as a lesser included offense to first degree murder.

B.    SUFFICIENCY OF THE EVIDENCE

Smalley argues there is insufficient evidence supporting his convictions for first degree murder and for first degree assault against Hendricks. We disagree.

We review challenges to the sufficiency of the evidence by considering whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). When the sufficiency of the evidence is challenged in a criminal case, all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant. *State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014). A claim of insufficiency admits the truth of the State's evidence and all reasonable inferences that can be drawn from the evidence. *Id*. Circumstantial evidence and direct evidence are considered equally reliable. *State v. Miller*, 179 Wn. App. 91, 105, 316 P.3d 1143 (2014).

1.      First Degree Murder

Smalley argues that there was insufficient evidence to support the jury's verdict finding him guilty of first degree murder. Smalley's argument is grounded on his contention that he did not act with extreme indifference; instead, he intentionally shot at King.

A person is guilty of first degree murder if "[u]nder circumstances manifesting an extreme indifference to human life, he or she engages in conduct which creates a grave risk of death to any person, and thereby causes the death of a person." RCW 9A.32.030(1)(b). The distinction between intentional murder and extreme indifference murder depends on whether the defendant's actions endangered life in general or simply endangered the life of a particular victim. *State v. Berge*, 25 Wn. App. 433, 437, 607 P.2d 1247, *review denied*, 94 Wn.2d 1016 (1980).

Here, Smalley may have purposefully shot at Walls, McIntyre, and King, but Walls, McIntyre, and King were standing with a crowd outside of a club filled with people. Smalley's actions were not directed at just one person with the intent to hurt that person. While Smalley shot at Walls, McIntyre, and King, he did not simply endanger only them; Smalley's shots endangered all of the people in the crowd around the entrance to the club. Smalley acted with extreme

indifference to all of the people in the crowd around the entrance to the club when he shot at Walls, McIntyre, and King. By endangering life in general, Smalley acted with extreme indifference.

Smalley contends that his case is more like *Berge* and *State v. Anderson*, 94 Wn.2d 176, 616 P.2d 612 (1980). However, *Berge* and *Anderson* are distinguishable because the defendants' actions were directed specifically toward a single person without endangering other people. *Berge*, 25 Wn. App. at 434 (defendant fired 30 shots into victim sleeping on a couch); *Anderson*, 94 Wn.2d at 179 (defendant placed child in bathtub filled with hot water). Unlike *Berge* and *Anderson*, Smalley's actions endangered an entire crowd of people, not simply the three people that Smalley intended to shoot. Accordingly, there was sufficient evidence to support the jury's verdict finding that Smalley committed first degree murder as charged.

2.      Assault Against Hendricks

Smalley argues that there was insufficient evidence to support the jury's verdict finding him guilty of first degree assault against Hendricks. Smalley's argument relies on there being other shooters besides himself and Avington who may have shot Hendricks.

A person is guilty of first degree assault "if he or she, with intent to inflict great bodily harm . . . [a]ssaults another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death." RCW 9A.36.011(1)(a).

Here, Smalley does not dispute that a firearm was used or that there was intent to inflict great bodily harm. Smalley only argues that there was insufficient evidence to establish that he or an accomplice actually assaulted Hendricks by shooting her. Smalley's argument is unpersuasive. First, Hendricks was at the entrance of the club and in the immediate vicinity of where Smalley admitted he was aiming and shooting. Therefore, there was sufficient evidence for the jury to infer

that Smalley shot Hendricks. Second, even if the jury did not infer that Smalley directly shot Hendricks, the jury could infer that an accomplice, either Avington or the third shooter in the parking lot, shot Hendricks because the State showed that the three shooters in the parking lot shot toward the crowd by the door. Accordingly, there was sufficient evidence supporting the jury's verdict that Smalley or an accomplice shot Hendricks.

C.      ACT ON APPEARANCES JURY INSTRUCTION

Smalley argues that the trial court erred by instructing the jury on the incorrect standard for using lawful force as it relates to the assault charge.[7] Specifically, Smalley argues that the jury should have been instructed that Smalley was entitled to "act on appearances" if he had a good faith belief based on reasonable grounds that he or another was in danger of only injury rather than great bodily injury. We disagree.

An "act on appearances" instruction instructs the jury that a defendant is entitled to act in self-defense based on a good faith and reasonable belief that there is an actual danger of injury. In other words, a defendant is entitled to act in self-defense based on the appearance of actual danger—actual danger is not required. A jury instruction that informs the jury that a defendant is entitled to act on the appearance of actual danger of injury, rather than great bodily injury, is appropriate in cases involving non-deadly force. *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d

---

[7] In the assignments of error, Smalley frames this issue as ineffective assistance of counsel. However, Smalley's argument is dedicated to whether the trial court erred in its instructions. Smalley only provides one conclusory sentence asserting that we "should hold that trial counsel was ineffective for not excepting to the failure to give his own proposed instruction." Br. of Appellant at 32-33. We do not consider assignments of error unsupported by argument or citation to authority. RAP 10.3(a)(6). Accordingly, we do not address Smalley's ineffective assistance of counsel claim.

177 (2009). "Deadly force" is specifically defined as "the intentional application of force through the use of firearms." RCW 9A.16.010(2).

Here, Smalley used deadly force by intentionally firing a firearm. Because Smalley used deadly force, he was not entitled to a jury instruction establishing the lawful use of non-deadly force.[8] In other words, because Smalley used deadly force, he was not entitled to a jury instruction stating that he was entitled to act on appearance of danger of only injury. Accordingly, the trial court's jury instruction was not in error.

D.      DISMISSAL OF JUROR 32

Smalley argues that the trial court erred by failing to follow the requirements of GR 37 in response to the objection raised to the peremptory challenge to juror 32.[9] We disagree.

GR 37 was established "to eliminate the unfair exclusion of potential jurors based on race or ethnicity." GR 37(a). "A party may object to the use of a peremptory challenge to raise the issue of improper bias." GR 37(c). Once an objection under GR 37 is made, "the party exercising the peremptory challenge shall articulate the reasons the peremptory challenge has been exercised." GR 37(d). After an objection is made and a response is given, the court shall evaluate

---

[8] Even the case the Smalley asserts is authoritative recognizes that the jury instruction used in this case sets out the standard for self-defense applicable in deadly force cases. *State v. Woods*, 138 Wn. App. 191, 201, 156 P.3d 309 (2007).

[9] The State argues that Smalley may not appeal the trial court's decision on the State's peremptory challenge because Avington made the GR 37 challenge rather than Smalley. However, RAP 2.5(a) provides, "A party may raise a claim of error which was not raised by the party in the trial court if another party on the same side of the case has raised the claim of error in the trial court." Because Smalley and Avington were co-defendants, they were on the same side of the case. Accordingly, Smalley may appeal the trial court's decision on GR 37 despite the fact that Avington made the challenge at the trial court rather than Smalley.

the reasons given in light of the totality of the circumstances. GR 37(e). "If the court determines that an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge, then the peremptory challenge shall be denied." GR 37(e).

GR 37(f) defines an objective observer as a person who "is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in Washington State." GR 37 also provides guidance for the circumstances that are to be considered, presumptively invalid reasons for exercising a peremptory challenge, and conduct that has also been historically associated with improper discrimination in jury selection. GR 37(g)-(i).

Although GR 37 does not specifically require that the trial court determine the race or ethnicity of a juror prior to entertaining a challenge under GR 37, it is clear that GR 37 is meant to address the historical and systemic exclusion of jurors based on race or ethnicity. GR 37(a). And the related, modified-*Batson*[10] test used in Washington requires that a defendant present a prima facie case of racial discrimination by demonstrating that the struck juror is a member of a cognizable racial group. *City of Seattle v. Erickson*, 188 Wn.2d 721, 732, 398 P.3d 1124 (2017).

Here, the record before us does not establish that juror 32 was a member of a cognizable racial or ethnic group. Neither the State nor the court identified juror 32 as a member of a racial or ethnic group. And Avington could not identify anything specifically demonstrating that juror 32 was a member of a racial or ethnic group, alleging only that juror 32 "appeared to be mixed with something" based on her hair color and slightly darker skin. 6 VRP at 932. And, on appeal,

---

[10] *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

Smalley identifies no additional facts that would establish that juror 32 is a member of a cognizable racial or ethnic group. Because there is nothing in the record establishing that juror 32 is a member of a cognizable racial or ethnic group and the purpose of GR 37 is to address unfair exclusion of juror based on race or ethnicity, Smalley has failed to show that GR 37 applies to the State's exercise of a peremptory challenge to dismiss juror 32.

E.      RECALLING JOHNSON AS A WITNESS

Smalley argues that the trial court denied him the right to present a defense by refusing his request to recall Johnson as a witness. We disagree.

Our Supreme Court has established a two-part test to determine whether a defendant's Sixth Amendment right to present a defense was violated. *State v. Jennings*, 199 Wn.2d 53, 58, 502 P.3d 1255 (2022). First, we review the trial court's evidentiary ruling for an abuse of discretion. *Id*. Then, we review de novo whether the exclusion of evidence violated the defendant's constitutional right to present a defense. *Id*. at 58-59.

1.      Evidentiary Ruling

We review a trial court's evidentiary rulings for an abuse of discretion. *Id*. at 59. "A trial court abuses its discretion if 'no reasonable person would take the view adopted by the trial court.'" *Id*. (internal quotation marks omitted) (quoting *State v. Atsbeha*, 142 Wn2d 904, 914, 16 P.3d 626 (2001)).

Under ER 401, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." However, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the

28

issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." ER 403. Additionally, ER 611(a)(2) allows the trial court to exercise reasonable control over the mode and order of interrogating witnesses in order to avoid needless consumption of time.

Here, Smalley specifically wanted to recall Johnson to address three issues: (1) whether she had said Smalley was bragging, (2) whether Smalley knew someone had been shot and killed at the time he was at Johnson's house, and (3) whether Johnson believed that Smalley was involved in making the threats against her. But, as the trial court pointed out, the issue regarding Smalley bragging had already been thoroughly addressed in Johnson's testimony and recalling Johnson to further address it would be needlessly cumulative and a waste of time. Further, it was clear from Johnson's testimony that she only overheard Smalley speaking and that she did not speak to Smalley or discuss the events with Smalley so it is unclear how Johnson's testimony would have been relevant to what Smalley did or did not know at the time he was making the statements. Finally, Johnson had already testified that a threat was made, there was no evidence linking Smalley to the threat, and Smalley already had an opportunity to cross-examine Johnson regarding the threat. The trial court reasonably expressed concern that allowing continued questioning regarding the threat could lead to prejudicial testimony regarding gangs that had already been excluded.

The trial court did not abuse its discretion by denying the request to recall Johnson to testify to evidence that was cumulative and potentially prejudicial. Because the trial court did not abuse its discretion in denying the request to recall Johnson, we must next determine whether exclusion of Johnson's additional testimony violated Smalley's constitutional right to present a defense.

2.      Constitutional Right to Present a Defense

"A criminal defendant's right to present a defense is guaranteed by both the federal and state constitutions." *Jennings*, 199 Wn.2d at 63. "However, the Constitution permits judges to 'exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.'" *Id.* (alterations in original) (internal quotation marks omitted) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)). When the trial court excludes relevant evidence, "the reviewing court must weigh the defendant's right to produce relevant evidence against the State's interest in limiting the prejudicial effects of that evidence to determine if excluding the evidence violates the defendant's constitutional rights." *Id.*

Here, as discussed above, the evidence that Smalley wanted to elicit by recalling Johnson was cumulative and posed the risk of introducing prejudicial gang evidence into the trial. Johnson had already testified extensively about whether Smalley was actually bragging about the shooting when she overheard him talking to her fiancé. And Johnson could not speak to what Smalley knew about King's death because she never spoke with Smalley. Therefore, exclusion of Johnson's testimony on these two issues did not violate Smalley's constitutional right to present a defense.

Further, additional questions regarding the threat made to Johnson's fiancé were collateral to Smalley's defense and posed the risk of introducing prejudicial gang evidence into the trial. There was no evidence introduced at trial that established the threat was related to Smalley. And additional evidence regarding whether Johnson thought the threat came from Smalley has little to no relevance to Smalley's self-defense claim. Therefore, exclusion of this additional testimony did not violate Smalley's right to present a defense.

F.       PROSECUTORIAL MISCONDUCT

Smalley raises various claims of prosecutorial misconduct occurring throughout trial and in closing argument. Smalley contends that the prosecutor's misconduct, either individually or its cumulative effect, requires reversal.

To prevail on a claim of prosecutorial misconduct, Smalley must show that the prosecutor's conduct was improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). First, we determine whether the prosecutor's conduct is improper. *Id*. at 759. If the prosecutor's conduct was improper, we must then determine whether the conduct was prejudicial. *Id*. at 760.

We determine whether the defendant was prejudiced under one of two standards of review. *Id*. "If the defendant objected at trial, the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." *Id*. If the defendant did not object at trial, the defendant must show that "the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Id.* at 760-61.

In order to show that the prosecutor's conduct was so flagrant and ill-intentioned that no instruction could have cured the resulting prejudice, the defendant must show that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id.* at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)). We "focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." *Id.* at 762.

1.       Trivializing Burden of Proof and Discounting Ability to Vote Not Guilty

Smalley argues that the prosecutor trivialized the burden of proof during closing argument by using a puzzle analogy. Smalley also argues that the prosecutor's statement that a not guilty vote would be a miscarriage of justice compounded the prosecutor's trivialization of the burden of proof. We disagree.

It is improper for the prosecutor to make arguments that misstate the State's burden to prove the defendant's guilt beyond a reasonable doubt. *State v. Lindsay*, 180 Wn.2d 423, 434, 326 P.3d 125 (2014). While references to a puzzle in discussing the "beyond a reasonable doubt" standard may result in prosecutorial misconduct, this has generally been limited to instances where prosecutors have quantified the percentage of the puzzle that needed to be completed in order for a jury to find that a crime was committed beyond a reasonable doubt. *Id.* at 436. On the other hand, the prosecutor does not commit misconduct where there is "no reference to any number or percentage and merely suggested that one could be certain of the picture beyond a reasonable doubt even with some pieces missing." *Id.*

Here, the prosecutor did not quantify a number or percentage of puzzle pieces that equated to reasonable doubt or beyond a reasonable doubt. And the prosecutor did not trivialize the burden of proof by equating it to simple everyday decisions. In fact, the prosecutor specifically reminded the jury that the beyond a reasonable doubt standard was not encountered in everyday decision making.

Further, the prosecutor did not tell the jury that a not guilty vote was a miscarriage of justice. Rather, in the context of reiterating the State's burden of proof, the prosecutor told the jurors that if they found that all the elements of the crime were proven beyond a reasonable doubt

but the jurors voted not guilty because of additional unanswered questions, then that would be a miscarriage of justice.

The prosecutor did not use an improper puzzle analogy nor did the prosecutor trivialize the burden of proof by equating it to every day decision making. And because the prosecutor did not tell the jury that voting not guilty was a miscarriage of justice, the prosecutor did not otherwise misstate the burden of proof. Accordingly, the prosecutor's comments were not improper.

2.      Arguing Facts Not in Evidence

Next, Smalley argues that the prosecutor argued facts not in evidence by creating a false narrative that self-defense was plan B and speculating about whether witnesses that were not called would have told the truth. We disagree.

A prosecutor enjoys wide latitude when making a closing argument. *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). We review allegedly improper comments in context of the entire argument. *Id*. A prosecutor is permitted to draw reasonable inferences from the evidence. *State v. Robinson*, 189 Wn. App. 877, 893, 359 P.3d 874 (2015). And a prosecutor is permitted to argue reasonable inferences from evidence respecting the credibility of witnesses. *Thorgerson*, 172 Wn.2d at 448. References to evidence outside the record constitutes misconduct. *Fisher*, 165 Wn.2d at 747.

The prosecutor's argument that self-defense was plan B was a reasonable inference from all of the evidence. There was evidence that Smalley left the scene of the shooting and almost immediately thereafter went to Hawaii using another person's identification. The reasonable inference from this evidence is that Smalley did not intend to admit involvement in the shooting. Further, given the undisputed video evidence in this case, it is reasonable to infer that the

defendants decided to pursue self-defense after realizing that they could not deny involvement in the shooting. The prosecutor's argument fit within the wide latitude prosecutors are given to make reasonable inferences from the evidence during closing argument. Therefore, the prosecutor's plan B argument was not improper.

Further, the prosecutor did not argue facts outside the record by arguing the uncalled witnesses would not have told the truth, but was making a fair response to defense counsel's closing argument. 18 VRP at 2882 ("You heard from [a defense counsel] why the State didn't call Mr. Cooper or Mr. Legend or any of these people."). A prosecutor is entitled to make a fair response to a defense argument so it was not misconduct for the prosecutor to offer its own assessment of the people who were not called as witnesses in response to the arguments made by the defense. *See State v. Brown*, 132 Wn.2d 529, 566, 940 P.2d 546 (1997), *cert. denied*, 523 U.S. 1007 (1998). Defense counsel made arguments speculating as to why the prosecutor did not call witnesses; thus, it is fair for the prosecutor to respond to that argument by offering their own explanation for why the State did not call the witnesses. Accordingly, the prosecutor's argument was not improper.

3. Shifting the Burden of Proof

Smalley also argues that the prosecutor shifted the burden of proof to the defendants by implying the defendants had a duty to retreat and that they had to justify all of their shots. Further, Smalley argues that the prosecutor shifted the burden of proof by arguing a different standard of proof applies when a defendant testifies, referring to the prosecutor's arguments relating to why the defendants did not call other witnesses to testify. We disagree.

To obtain a self-defense jury instruction, the defense must produce some evidence demonstrating self-defense. *State v. Walden*, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997). Once the defendant meets this burden, the burden shifts to the State to disprove self-defense beyond a reasonable doubt. *Id*. "The mere mention that defense evidence is lacking does not constitute prosecutorial misconduct or shift the burden of proof to the defense." *State v. Jackson*, 150 Wn. App. 877, 885-86, 209 P.3d 553, *review denied*, 167 Wn.2d 1007 (2009).

Here, the prosecutor's argument as whole did not impermissibly shift the burden of proof. As discussed above, the prosecutor did not misstate or trivialize the burden of proof. The prosecutor repeatedly stated that the State carried the burden. However, the defendants did present evidence of self-defense and it was then the State's burden to disprove self-defense. One of the ways that the State attempted to disprove self-defense was to argue that the evidence presented by the defense was lacking and insufficient. This alone does not impermissibly shift the burden of proof. *Id*. Accordingly, the prosecutor's conduct was not improper.

Further, the prosecutor did not improperly argue that the burden shifted to the defense when the defense chose to put on evidence. Instead, the prosecutor argued that, while the burden of proof always remained with the State, when the defense presented evidence, the weight and credibility of that evidence was subject to the same scrutiny as the State's evidence.[11] Arguing

---

[11] Specifically, the prosecutor argued:

> This is important, too. These defendants when they testified—or, sorry— these defendants have no burden of proof. Let's be clear about that. If you choose to put on a case, that's your right. If you choose not to put on a case, that's your right. If you don't put on a case, like for example Mr. Davis, you can't hold that against Mr. Davis. You have a right to remain silent, so on and so forth. The burden does at all times remain with the State.

that the weight of the evidence presented by the defense is subject to scrutiny is not improperly shifting the burden of proof. Accordingly, the prosecutor's argument was not improper.

4.      Comment on Exercise of Constitutional Rights

Smalley argues that the prosecutor committed misconduct by improperly commenting on Smalley's exercise of constitutional rights. We disagree.

Our Supreme Court "has recognized that '[t]he State can take no action which will unnecessarily chill or penalize the assertion of a constitutional right and the State may not draw adverse inferences from the exercise of a constitutional right.'" *State v. Gregory*, 158 Wn.2d 759, 806, 147 P.3d 1201 (2006) (alteration in original) (internal quotation marks omitted) (quoting *State v. Rupe*, 101 Wn.2d 664, 705, 683 P.2d 571 (1984)), *overruled on other grounds by State v. W.R., Jr.*, 181 Wn.2d 757, 336 P.3d 1134 (2014). However, "not all arguments touching upon a defendant's constitutional rights are impermissible comments on the exercise of those rights." *Id*. "[T]he relevant issue [is] 'whether the prosecutor manifestly intended the remarks to be a comment on that right.'" *Id*. at 807 (quoting *State v. Crane*, 116 Wn.2d 315, 331, 804 P.2d 10, *cert. denied*, 501 U.S. 1237 (1991)). "[S]o long as the focus of the questioning or argument 'is not upon the exercise of the constitutional right itself,' the inquiry or argument does not infringe upon a

---

> But when you choose to present evidence, when you choose to testify, your testimony, your evidence is subject to the same exacting scrutiny as the State's evidence. You don't get a free pass. Because "I don't have a burden; I can put anything I want on the stand; I can say whatever I want," that's not how it works. When you choose to present evidence, it's subject to the same exact scrutiny, and when you say things like, "well, I saw a gun and my buddies who were right there looking in the same direction would have seen the same thing unless they're blind," it is appropriate to say why aren't they here?

18 VRP at 2881-82.

constitutional right." *Id.* (quoting *State v. Miller*, 110 Wn. App. 283, 284, 40 P.3d 692, *review denied*, 147 Wn.2d 1011 (2002)).

        a.      Comments on right to carry firearms

Smalley argues that the prosecutor improperly commented on his right to carry a firearm by repeatedly questioning why Smalley would need a gun for self-defense. Smalley also relies on several questions that the prosecutor asked while questioning witnesses.[12]

Here, the prosecutor's comments were not an infringement on Smalley's constitutional right to carry a firearm for self-defense. This case obviously involved firearms and two competing narratives: the State arguing that the defendants escalated a physical altercation into a deadly confrontation by using firearms and the defendants arguing that they acted solely in self-defense in response to Walls displaying a firearm. The prosecutor's questions went to undermining the defendant's claim of self-defense, not to a direct comment that the defendants were guilty because they were carrying firearms. Because the focus of the prosecutor's comments was not on the exercise of the right to carry firearms, the prosecutor's questions were not an improper comment on the exercise of Smalley's constitutional right.

---

[12] Specifically, Smalley references the following questions:

> 12RP 1877 ("Do you know why Mr. Smalley needed you to buy guns on his behalf?"); 16RP 2405 ("And that's why you armed yourself with a firearm that had at least 17 rounds in it, correct?"); 16RP 2438-39 (questioning why Smalley needed another gun after he gave the weapon from the incident away); 17RP 2551 (to Mr. Avington—"I was curious. You said you were coming up here initially to go meet some girls; is that right? . . . . What's the need for the loaded .40 caliber gun?").

Br. of Appellant at 64, n.51.

b.      Comment on the right to remain silent

Smalley argues that the prosecutor improperly commented on Smalley's right to remain silent by introducing evidence that Smalley did not stay at the scene, did not contact the police, and was uncooperative when arrested in Hawaii.

In 2013, the United States Supreme Court held that the prosecution's use of the defendant's silence in a voluntary police interview did not violate the Fifth Amendment because the defendant did not actually invoke the privilege. *Salinas v. Texas*, 570 U.S. 178, 186, 133 S. Ct. 2174, 186 L. Ed. 2d 376 (2013) (Alito, J. lead opinion). Washington courts have recognized that, after the decision in *Salinas*, there is a meaningful distinction between comments on pre-arrest and post-arrest silence. *State v. Terry*, 181 Wn. App. 880, 888-89, 328 P.3d 932 (2014); *State v. Magana*, 197 Wn. App. 189, 195, 389 P.3d 654 (2016), *abrogated on other grounds by State v. Johnson*, 4 Wn. App. 2d 352, 421 P.3d 969, *review denied*, 192 Wn.2d 1003 (2018) ("The rule from *Salinas* is that absent an express invocation of the right to silence, the Fifth Amendment is not an obstacle to the State's introduction of a suspect's pre-arrest silence as evidence of guilt.").

Here, any comments that the prosecutor may have made on Smalley's silence were pre-arrest and, therefore, did not implicate the Fifth Amendment. Further, most of what Smalley complains about is actually comment on his actions rather than his silence. *See State v. Freeburg*, 105 Wn. App. 492, 497-98, 20 P.3d 984 (2001) ("Evidence of flight is admissible if it creates 'a reasonable and substantive inference that defendant's departure from the scene was an instinctive or impulsive reaction to a consciousness of guilt or was a deliberate effort to evade arrest and prosecution.' Actual flight is not the only evidence in this category; evidence of resistance to arrest, concealment, assumption of a false name, and related conduct are admissible if they allow

a reasonable inference of consciousness of guilt of the charged crime." (footnote omitted) (quoting *State v. Nichols*, 5 Wn. App. 657, 660, 491 P.2d 677 (1971)). Because Smalley never invoked his right to remain silent and his conduct was evidence of flight the prosecutor could reasonably draw inferences of guilt from, the prosecutor's conduct was not improper.

### c. Comment on right to a jury trial

Smalley argues that the prosecutor improperly commented on his right to a jury trial during opening statements. Specifically, Smalley relies on the following statement made by the prosecutor during opening statements:

> That's why you're here today. Make no mistake about it. And that's why they're here. They are here today because they chose not only to throw away their own lives but to end the life of a young man and to paralyze a young woman who had nothing to do with any of them. That's why you're here.

7 VRP at 976-77.

Here, the prosecutor's comment did not invite the jury to draw a negative inference from the defendant's exercising their right to a jury trial. The prosecutor's statement was not focused on the defendant's choice to have a jury trial but rather that the case was about the crimes the defendants allegedly committed—specifically, killing King and paralyzing Hendricks. The focus of the prosecutor's comment was on the defendant's actions, not on the defendants' exercise of their right to a jury trial. Accordingly, the prosecutor's comments were not improper.

### 5. Disparaging Defense Counsel and Vouching for Police

Smalley further argues that the prosecutor committed misconduct by vouching for the police and disparaging defense counsel. We disagree.

"Prosecutorial statements that malign defense counsel can severely damage an accused's opportunity to present his or her case and are therefore impermissible." *Lindsay*, 180 Wn.2d at 432. And "[i]mproper vouching occurs when the prosecutor expresses a personal belief in the veracity of a witness or indicates that evidence not presented at trial supports the testimony of a witness." *Thorgerson*, 172 Wn.2d at 443. It is also improper for a prosecutor to make comments that impugn the role or integrity of defense counsel. *Lindsay*, 180 Wn.2d at 432.

Here, the State pointed out that defendants fled and hid, and it took months for law enforcement to locate them. The State referenced that finding the defendants was "[g]reat police work." 18 VRP at 2714. The State also went on to state, "This self-defense claim is preposterous considering the outstanding law enforcement work on identifying them." 18 VRP at 2714. The State further argued:

> But when I say you're entitled to an attorney who will advocate for what's in your best interest, make no mistake about it. What is in these men's best interest is to not be held accountable for the 30 rounds they rained down that club that night, and so in pursuit of that objective, counsel will advance any argument, any claim, any assertion of what the evidence is that moves the ball in that direction, whether it is true or not.

18 VRP at 2831-32.

Here, the prosecutor did not express a personal opinion on the veracity of law enforcement witnesses by commenting that they did great and outstanding police work because this was not a comment specifically on the veracity of the witnesses; rather, it was simply an offhand comment on the police work done on the case in general. And even assuming, without deciding, that the prosecutor's remarks regarding defense counsel and labeling the self-defense claim as preposterous were improper, Smalley fails to meet his burden to establish prejudice.

Because Smalley did not object to the State's remarks, Smalley must show that the remarks were so flagrant and ill-intentioned that an objection would not cure the prejudicial effect. *See Emery*, 174 Wn.2d at 760-61. If Smalley had objected to the prosecutor's comments about defense counsel's role or labeling the self-defense claim as preposterous, the trial court could have given a curative instruction and instructed the jury to disregard the isolated comments. Because the prosecutor's improper comments were isolated and a timely objection could have cured the prejudice, Smalley has failed to meet his burden to show prejudice.

6.      Case Based on Sarcasm and Appeal to Emotion

Smalley argues that the prosecutors in this case engaged in sarcastic and mocking behavior throughout the trial, particularly in the prosecutors' cross-examination of the defendants. Smalley also alleges that the prosecutors compounded this misconduct by sneaking in gang evidence through Snapchat videos. We disagree.

Here, the issues relating to the prosecutors' sarcastic and mocking behavior and allegations that the prosecutors improperly appealed to emotion were already resolved by the trial court, and Smalley does not assign error to those trial court rulings. The trial court explicitly found that the prosecutor did not engage in any misconduct. Even if Smalley had assigned error to the trial court's ruling on the motion to dismiss, we give deference to the trial court's ruling because the trial court is in the best position to evaluate prejudice. *State v. Stenson*, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997), *cert. denied*, 523 U.S. 1008 (1998). Based on the trial court's unchallenged ruling on the motion to dismiss, Smalley has failed to show that the prosecutor engaged in improper conduct based on sarcasm and appeal to emotion.

Further, Smalley alleges that the prosecutors' improper conduct was compounded by the prosecutors sneaking gang evidence into the trial. This allegation is belied by the record on appeal, including Smalley's counsel's own statements to the trial court. When Smalley's counsel first brought the Snapchat videos to the attention of the trial court, counsel clearly stated he did not believe the State saw the gang signs in the videos. However, two days later, Smalley accused the prosecutors of knowing that the videos contained gang signs despite the prosecutors clearly stating that they did not identify any of the hand gestures as gang signs. Despite this record, Smalley now alleges on appeal that the prosecutors committed misconduct by sneaking this evidence into the record. That did not happen.

The prosecutors proffered evidence that the court ruled was admissible. There is no evidence that the State knew the evidence contained potential gang signs. And after the defense identified the potential issue, the trial court, not the State, determined that there was not enough evidence establishing the hand gestures were gang signs to order already admitted evidence be redacted. Further, the trial court explicitly ordered that the attorneys could not make reference to the hand signs.

Smalley does not assign error to the trial court's evidentiary rulings related to the Snapchat videos nor does he allege that the prosecutors violated the trial court's ruling prohibiting referencing the hand signs. Smalley's recharacterization of the facts does not establish that the prosecutors acted improperly by sneaking gang evidence into the trial. Smalley has failed to show that the prosecutors acted improperly.

No. 55212-4-II

7.      Cumulative Error

Smalley also argues that the cumulative errors resulting from prosecutorial misconduct requires reversal. We disagree.

Cumulative error applies when numerous errors deny the defendant their right to a fair trial, "even if each error standing alone would be harmless." *State v. Venegas*, 155 Wn. App. 507, 520, 228 P.3d 813, *review denied*, 170 Wn.2d 1003 (2010).

Here, the only errors related to prosecutorial misconduct are possibly the prosecutor's two comments disparaging defense counsel. Even together, these alleged errors did not deprive Smalley of a fair trial. Because the prosecutor's comments were brief and extremely isolated, and were made in the context of a much larger, more extensive argument, and in light of the overwhelming evidence, the two alleged improper comments did not deprive Smalley his right to a fair trial. Accordingly, cumulative error does not require reversal of Smalley's convictions.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Glasgow, CJ

Price, J.

43